Fred THOMPSON, Plaintiff,

v.

BROTHERHOOD OF SLEEPING CAR PORTERS, an Unincorporated Railroad Labor Organization, National in Scope, Defendant.

Civ. A. No. 6889.

United States District Court
E. D. South Carolina,
Florence Division.

July 12, 1965.

Dusenbury, Dusenbury & McKenzie, Florence, S. C., for plaintiff.

Joseph L. Nettles, Columbia, S. C., for defendant.

HEMPHILL, Chief Judge.

Heard by the Court, with a jury, at the December, 1964 Term of Civil Court for the Florence Division, United States Courts for the Eastern District of South Carolina. Plaintiff claims that the acts of defendant Brotherhood caused him to lose his seniority as a Mail Porter, with resulting deprivation of his rightful tours of duty and opportunities for employment with the ACL Railroad. He sought actual damages for past losses, plus allowance for such losses as might accrue pending a final determination, punitive damages, and future losses. Trial resulted in a verdict for plaintiff for Fifty Six Thousand Five Hundred Dollars actual damages.

In due time defendant offered appropriate motion, to wit:

> Now comes the defendant and moves to have the verdict in the cause and judgment entered thereon set aside, and to have judgment entered in favor of the defendant in accordance with its motion for directed verdict.

> In the alternative, defendant moves the Court for a new trial upon the following grounds:

> (a) That the verdict was contrary to the weight of the evidence.

(b) That the Court erred in refusing defendant's Requests to Charge numbers four (4), five (5), six (6), and eight (8).

(c) That the Court erred in charging the jury that, in determining damages, they should take into consideration possible future loss of earnings.

(d) That the amount of the verdict is excessive, and rests upon speculation and conjecture.

Hearing on the motion was postponed to convenience counsel in obtaining and studying the trial transcript.

Initiated October 18, 1964 in the Court of Common Pleas for Florence County, South Carolina, removal procedures engaged the jurisdiction of this forum. Thereafter, in December of 1961 trial was begun before a jury at Florence; at the conclusion of plaintiff's case a motion by defendant for involuntary dismissal (directed verdict) was granted.

Upon appeal the case was "Reversed and remanded for a new trial in accordance with the opinion of this court." [1] From that opinion, this Court finds its direction:

In the present case, it appears necessary to pursue only one line of inquiry to resolve the questions of "invidious discrimination," "reasonableness," "good faith and honesty": Did the plaintiff show that he received different or substantially sub-standard representation at the hands of the Brotherhood? If so, was it because of some improper reason, such as his unsatisfactory union status? Did this treatment cause him injury? If the answers of the trier of fact to the three questions are in the affirmative, the plaintiff is entitled to relief.

## WAS THE VERDICT CONTRARY TO THE WEIGHT OF THE EVIDENCE?

Defendant strongly avers that there is no evidence in the record to support the jury's verdict. In response, let us excerpt from that record.

Introduced into evidence and published was this letter:

Mr. Fred N. Thompson
310 B. So. Ravenel Street
Florence, South Carolina

My Dear Brother Thompson:

I have your letter of May 3, 1956 and have carefully noted the contents, I am sure you were aware that there was nothing I could do until you became a fully fledged member; now that you have followed through on your responsibility, rest assured that we will do the same at this end. I have instructed your local chairman to request a formal hearing on your case. I trust that you will cooperate in every way possible to get this case started in order that we may be able to process it into the Railroad.

I have written to Brother Smith and expect that he will be in touch with you. I regret the delay in answering you but I have been involved in a major promotion of a Civil Rights Rally to be held in Madison Square Garden May 24th.

It is my hope that this matter can be brought to a speedy conclusion. I am returning herewith the letter from Mr. Faulkner.

Fraternally yours,
/s/ B. F. McLaurin
B. F. McLaurin
Internal Field Organizer

*BFM*

It is revealing to note as well another letter from Mr. McLaurin, dated November 23, 1954, addressed to all train por-

---

1. U. S. Court of Appeals, 4th Circuit; See 316 F.2d 191.

ters, under defendant's letterhead, which stated:

It is a well-known fact that porters are off their jobs today who ordinarily would be working if they had been members in good standing in the organization.

The record is replete with testimony of the plaintiff as to how the defendant Union did not fulfill its obligation under the Act, and the Union appropriately attempted to refute. The issues were properly left to the jury.

The Court would be remiss if it did not outline a portion of the record which characterized the "aura" around the defendant Union which was being charged with a breach of its statutory duty by plaintiff.

A past officer in the local Union was being examined. The colloquy was as follows:

COURT: Do you collect the dues?

WITNESS: No, sir.

COURT: Who collects them?

WITNESS: Secretary-treasurer.

COURT: Well, if you had been elected secretary-treasurer instead of local chairman, would you have collected the dues?

WITNESS: Yes, sir.

COURT: Where would you collect them?

WITNESS: At our meetings. We have meetings different places.

COURT: In South Carolina?

WITNESS: Yes, sir.

COURT: Where would the dues be sent?

WITNESS: Richmond, Virginia.

COURT: To whom?

WITNESS: George McNair.

COURT: Who is he?

WITNESS: He is the general secretary-treasurer, Local No. 6.

COURT: Local No. 6?

WITNESS: Yes, sir.

COURT: Did the dues go to the Brotherhood?

WITNESS: That is as far as we send them. They send it on to the Brotherhood.

COURT: How much of your dues go to the Brotherhood?

WITNESS: I don't know. We keep a quarter out of the dollar out of every man's dues and I think the general chairman keeps a dollar.

COURT: How much are the dues?

WITNESS: Five dollars.

COURT: A month?

WITNESS: Yes, sir.

COURT: You pay five dollars a month and the local here keeps a quarter?

WITNESS: Yes, sir.

COURT: Who do you say gets a dollar?

WITNESS: The general chairman.

COURT: Where does he hang out?

WITNESS: He is in Richmond and he runs here too.

COURT: How much goes to the national Brotherhood?

WITNESS: It ought to be about $3.75.

COURT: What do you get for your dues that you send to the national Brotherhood?

WITNESS: What did I get for it, sir?

COURT: Yes, sir.

WITNESS: I get a receipt for it.

COURT: What else do you get?

WITNESS: That it all I get. The general chairman gets all the rest.

COURT: What is his salary?

WITNESS: I don't know, sir, I never asked him.

COURT: What do you get for the money you send to the Brotherhood?

WITNESS: Twenty five cents out of—

COURT: Twenty five cents out of five dollars?

WITNESS: Yes, sir.

COURT: What else do you get?

WITNESS: That is all.

COURT: That is all you get?

WITNESS: Yes, sir.

This Court does not suggest that this evidence is superior or controlling, but the jury had the right, the duty to consider whether, dues or no dues, the Brotherhood, as the recognized representative bargaining agent, performed, or neglected, its duty. As was said in the Circuit Court opinion:

> But, any discrimination in treatment must be based upon relevant, non-invidious distinctions for, while "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, [it is] subject always to complete good faith and honesty of purpose in the exercise of its discretion.

The record shows repeated efforts of plaintiff to obtain relief, protection of his job. What impact the jury gave to the reasoning that defendant *knew* of his complaint, and did not act in good faith, this Court will not interpret; evidently the jury believed plaintiff had a right to recover.

Various exhibits, correspondence, are in the record. The jury was strongly charged on the burden of proof. This Court now refuses to interpret the proof, as this part of defendant's motion seeks.

Sufficient evidence was presented upon which the jury could so weigh the evidence as to warrant a verdict for plaintiff. The Court will not set aside.

### REQUESTS TO CHARGE

Refused Request No. 4 was:

> I charge you that in order for Thompson to recover, he must first prove that there was merit in his claim to mail porter seniority. If he was in fact not entitled to it, then he cannot complain because he was not given it; and whether the Brotherhood "represented" him fairly or unfairly in his claim is immaterial.

As to Thompson's claim to be placed on the Mail Porters' Seniority Roster as of 1948, I charge you that if you find he failed to protest the 1949 roster within sixty days after January 1, 1949, he lost forever his right to 1948 seniority as a Mail Porter.

As to Thompson's claim to be placed on the Mail Porters' Seniority Roster for 1953, on account of Mail Porters runs in 1953, I charge you that if Thompson were protecting a regular run as train porter—that is, had a regular job as train porter, the railroad could require that he protect his regular run as train porter, and that he was therefore not eligible at the same time to acquire Mail Porters seniority for occasional mail porter runs made while he held a regular job as Train Porter.

The Court charged: (included in the above)

As to Thompson's claim to be placed on the Mail Porters' Seniority Roster as of 1948, I charge you that if you find he failed to protest the 1949 roster within sixty days after January 1, 1949, he lost forever his right to 1948 seniority as a Mail Porter.

Portions refused were refused because either included in the General Charge or were a charge on the facts:

Request No. 5 was:

> I charge you further that if you find that Thompson was entitled to be placed on the Mail Porters' Seniority Roster prior to 1956, it does not therefore follow that he has proven his case against the Brotherhood. For he must then prove that the Brotherhood failed to represent him in his claim in the manner required under the Federal Railway Labor Act (45 U.S.C.A., Sec. 152). As to this, I charge you that:
>
>> In order to establish a breach by the Brotherhood of its duty to represent Fred Thompson fairly, as the bargaining representative

of the porters subject to the bargaining agreement, it is not enough to prove that the Brotherhood was wrong when it agreed with the railroad's interpretation of the contract so that Thompson was not placed on the Mail Porters' Roster prior to 1956. The duty of the Brotherhood was no more than to forbear from hostile discrimination against him. It is not enough to show that it acted arbitrarily; Thompson must prove that the arbitrariness was of the bad faith kind; something akin to actual malice is required. It is not a violation of the Federal law under which Thompson is suing that the Brotherhood failed to satisfy Thompson or that it improperly balanced the rights of Thompson and the other porters it represents. Cunningham v. Erie Ry., 266 F.2d 411, 417 (2nd Cir. 1959).

This was refused as written. This Court instead used the language of the Fourth Circuit Court of Appeals. In addition, the matters were treated in the General Charge.

Refused Request No. 6 was:

I charge you that "fair representation" does not require that the Brotherhood agitate endlessly at the instance of any employee who may consider himself aggrieved. The Brotherhood has a wide range of discretion within which to decide whether or how far a particular claim warrants prosecution. If it concludes that a particular claim has been carried as far as the merits of the claim warrant, and acts in good faith in so concluding, then it is not liable for closing the claim even though you may conclude that the Brotherhood was in fact incorrect.

I therefore charge you that if the Brotherhood was acting in good faith in concluding that the collective bargaining agreement relating to seniority did not require the Railroad to put Thompson on the Mail Porters' Seniority Roster with a sen-

iority date earlier than 1956, you shall find for the defendant.

The content was covered in the General Charge.

Refused Request No. 8 was:

I charge you that if you find that Fred Thompson was entitled to Mail Porter Seniority prior to October 22, 1956, and if you find further that the Brotherhood did not represent him fairly in his claim, as the term "fairly" has been previously defined by me, then you should award such damages as he has proved he has sustained to this date. The measure of damages is the amount of wages he would have earned as a Mail Porter from the date his job as Train Porter terminated to the present date, minus such money as he received during this period by reason of wages earned elsewhere and unemployment benefits under the Railway Retirement Act.

In this connection, I charge you that it was his duty to minimize damages by diligently seeking employment within his capabilities, and his failure so to do would require you to further diminish his damages by the amount he would have earned had he sought such employment.

This was refused because the Court charged on future loss of earnings (see (c) of motion for judgment N.O.V.).

THE QUESTION OF FUTURE DAMAGES:

The jury was charged, on damages, as follows:

Now, in that connection: If the plaintiff has satisfied you in that he has a just claim and that he has been wronged; as I have charged you, then the next question would be what damages would he receive. The only question of damages in this case is a question of what is known as actual damages and actual damages are compensatory damages. That is what he lost or what he suffered.

The Complaint in this particular case says that he suffered damages because: Paragraph 11 says and the defendant denies:

"That when plaintiff was regularly employed with the Railroad his wages averaged in excess of Three Hundred ($300.00) Dollars per month. That since that time, plaintiff has been almost totally unemployed and has lost certain property." He says that by virtue of this he has lost money—been injured in the sum of—damaged in the sum of $200,000.00; so in no event could you find no more than $200,000.00 in this particular case. That is the maximum.

Now, the plaintiff in this case has proven that he is 43 years of age; having been born, as I recollect it was stipulated, April 8, 1921.

I charge you, as a matter of law in this case, if you find he has been injured or wronged and if you find he has been damaged you are not only entitled to consider what damages he has already suffered but if he has proven it, if he has proven he has suffered any damage, to consider any damages he will suffer in the future. In that connection, I charge you, Ladies and Gentlemen of the Jury; If you find a breach of defendant's duties which the law imposes upon the defendant that the right to recover damages accrues upon the breach. If they have failed to represent him as they should in the manner I have charged you, that would give him a right to recover damages.

The rule of damages in such a case, is what would it come to him, had there not been a breach less whatever he might earn by the exercise by reasonable and proper diligence on his part and, of course, in determining this you can look to a time after the breach and further you can look to a time after the

bringing of the law suit; the latter is called future damages. In that connection, I charge you, that any person suffering injury is under a duty to mitigate. If a man has some injury and yet it causes him a loss, if he can cut down on that loss: In this case, if he can earn money it is his duty to earn as much as he can to mitigate any loss he suffered, if he suffered any loss.

If you find that the plaintiff is entitled to recover, there is objection to the recovery, that the damages are difficult to ascertain because they depend upon conditions and uncertain events. The fact that damages are uncertain and difficult to ascertain is not regarded as sufficient reason for denying all relief.

You must remember, of course, you are not permitted to speculate but must make your decision in accordance with the evidence before you and if you consider future damages in this case: I charge you, that we have in evidence and the Court takes judicial notice, only for the purpose of charging you, what the South Carolina recognition is. It is what is known as a mortuary table which gives the life expectancy of a man. The life expectancy of a man age 43 is 29.54 years, if you find a man is entitled to future damges.

Now, Mr. Foreman and Ladies and Gentlemen of the Jury: I have charged you rather fully and more lengthy than I cared to charge you but that is my duty. Thank you for your patience with me. And you, as Jurors, know that all twelve must agree on a verdict. When you have reached a verdict you record that verdict in one or two forms.

Chief Judge Sobeloff's opinion [2] stated: "Thompson's theory posits a federal right, and therefore federal rather than state law governs." Cited in support of this declaration was the famous Lincoln

2. See Note 1 supra.

Mills of Alabama v. Textile Workers Union of America case, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. The Lincoln Mills case and subsequent cases (International Association of Machinists v. Central Airlines, Inc., 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67; Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580) have enjoined courts henceforth in labor relations cases to evolve a "comprehensive," "uniform" body of federal substantive law, applying and incorporating state rules of law only where it is helpful and appropriate.

█ A crucial issue to be determined on this question involves a body of law that has evolved and developed in this century. With labor unions came collective bargaining agreements, seniority, and federal statutes. Seniority rights basically are contract rights and flow from the collective bargaining agreement between the Union and the Company.

Plaintiff in support of his claim asserts:

1. The agreement can provide that upon the happening of certain contingencies, rights, e. g., seniority, can extend beyond the term of the contract from which they stem.

2. Certain rights, such as vacation pay, retirement benefits, severance pay, seniority, etc., can become "vested" and extend prospectively into the future and beyond the term of the particular contract from which they arise.

3. The earlier rule that seniority rights are to be narrowly construed with damages being limited to the term of the agreement or date of trial has been overruled or modified by the latest federal decisions so that a plaintiff's remedy may now include the *en futuro* aspect of seniority rights.

4. The Lincoln Mills case, supra, enjoins the courts to make these rights in this field subject to a uniform and comprehensive body of federal substantive law.

5. The agreement between the Brotherhood of Sleeping Car Porters and the ACL specifically provided that "seniority * * * shall begin as of the date of employment * * * and *shall terminate on the last date of the calendar month in which the employee attains the age of 70.* * * * and when that occurs, the *provisions of this agreement * * ** shall automatically terminate as to each employee so retired." [Emphasis supplied.]

6. The agreement can provide for rights to extend beyond the term of the agreement upon the happening of a contingency occurring during the term of the agreement, and when that contingency occurs during the term of the agreement, the rights "vest" and extend prospectively beyond the term of the agreement and can be enforced and protected thereafter.

7. Where there has been malicious interference with contractual relations (employment) substantial damages may be awarded even where the contract of employment is one terminable at will.

The old rule (holding seniority cannot extend beyond the term of the agreement) was enunciated in Elder v. New York Central R. Co., 152 F.2d 361, 364 (6th Cir. 1945); System Federation No. 59 of Railways Employees Department of American Federation of Labor v. Louisiana & A. R. Co., 119 F.2d 509, 515 (5th Cir. 1941); McMullans v. Kansas, Oklahoma & Gulf Ry. Co., 229 F.2d 50 (10th Cir. 1956), Colbert v. Brotherhood of R. R. Trainmen, 206 F.2d 9 (9th Cir. 1953); and Shiels v. Baltimore and Ohio Ry. Co., 154 F.Supp. 917 (S.D.Ind. 1957) which last case was specifically relied upon by counsel for defendant as being controlling here). The more modern rule recognizing the "future" aspects of seniority is developed in Zdanok v. Glidden Co., 288 F.2d 99, 99 A.L.R.2d 965, (2d Cir. 1961), aff'd 370 U.S. 530, 82 S.Ct. 1458, 8 L.Ed. 671; Giordano v. Mack Trucks, Inc., 203 F.Supp. 905 (D.

N.J.1962); Piano and Musical Instrument Workers Union Local 2549 v. W. W. Kimball Co., 221 F.Supp. 461 (N.D.Ill. 1963); and United Shoe Workers v. Brooks Shoe Manufacturing Co., 187 F. Supp. 509 (E.D.Pa.1960).

Soon after the Zdanok decision was handed down, it was recognized as "certain to be a landmark in the development of the new federal law." Frances V. Lowden, Jr., writing in 48 Virginia Law Review, 291, *Survival of Seniority Rights Under Collective Agreements: Zdanok v. Glidden Co.*, stressed the landmark significance of the holding in light of the Supreme Court's instruction in the Lincoln Mill case to formulate a new federal law of labor contracts. The author acknowledged that "despite the fact that the decision in Glidden contains inconsistencies and ambiguities, as indicated, it is, for the moment at least being cited and followed for the proposition that *under the new federal law seniority survives the contract.*"

In another law review article, *An Industrial Change: Zdanok v. Glidden Co.*, 47 Minn. 521, the author Alfred W. Blumrosen, states that "In summary, if the collective contract contains a promise to re-employ in order of seniority *after* the contract's 'terminal date,' *the promise is enforceable according to its terms* on behalf of an employee laid off *during* the contract period. It cannot be enforced by an employee laid off after the collective contract expired, but he may be able to establish that *terms of the collective contract carried over into his individual contract and thus indirectly enforce it.*" [Emphasis supplied.]

This Court is again mindful of the language of the Fourth Circuit Court opinion:

At such new trial, the plaintiff should be permitted, as he requested in the District Court, to amend his complaint to plead 1953, 1955, or any other appropriate year as to which he can allege, in good faith, that had the Brotherhood acted with sufficient regard for his rights he would have been entitled and able to secure seniority as a Mail Porter.

The opinion, of course, does not say whether the writer had in mind Zdanok when it so ruled, but once the deprivation was a *fait accompli*, how long the consequences might flow was for the jury to consider.

The wisdom of the Zdanok decision lies in its synthesis of the contract and status considerations. The decision protects employer rights to transfer subject to such contractural limitations as may be agreed to by the immediate parties. By placing the burden of limitation on those who would negate seniority rights, the Court has provided some small measure of protection for the worker caught up in the process of industrial change.

Following in the wake of Zdanok v. Glidden is Piano and Musical Instrument Workers Union v. Kimball, 221 F.Supp. 461, supra, which held:

As in the case of pension rights and retirement benefits, seniority rights extend into the future. Are these rights, which are often referred to as 'vested rights' (though perhaps improperly so), and which arise out of the terms of a union agreement to be honored only so long as the whole of the agreement is enforceable? [Are these rights to be held unenforceable?] Are these rights to be held for naught thereafter? Zdanok v. Glidden Company, 2 Cir., 288 F.2d 99, answers these questions in the negative.

In Oddie v. Ross Gear and Tool Co., 195 F.Supp. 826 (E.D.Mich.1961), the Court stated:

The issue here is, do seniority rights survive by analogy as an earned right? In Zdanok v. Glidden Co., 2 Cir., 288 F.2d 99, 103, seniority is called a 'vested' right or one 'earned', as a type of unemployment insurance 'earned', and acquired, by continuous service. * * We must then return to the contract to determine whether the sen-

iority rights and benefits of the plaintiff are in jeopardy. This Court feels bound by the Glidden case, supra, and its reasoning, and since there is nothing within the contract now in force to the contrary, those seniority rights are to continue.

This case was reversed on appeal, the appellate court holding that on the facts the lower court ruling was distinguishable from the Zdanok v. Glidden facts.

United Shoe Workers v. Brooks Shoe Manufacturing Co., 187 F.Supp. 509 (E. D.Pa.1960) plaintiff union sought damages against the defendant Brooks for breach of its collective bargaining agreement. The Court's decision in this case was significant in three respects: (1) It awarded compensatory damages for a period *beyond* the term of the collective bargaining contract in effect; (2) It awarded punitive damages for breach of contract on the theory that the contract violation was also an "unfair labor practice" and (3) It evinced dissatisfaction with the somewhat sterile and time honored remedies employed by the National Labor Relations Board in handling "runaway" shops as an unfair labor practice.

The Court first considered $4,251.00 representing the loss in union dues from the date of the shutdown of the Philadelphia plant to the time of trial. The defendant contended that past dues lost should be calculated only for the shorter period during the effective term of the collective bargaining contract.

This argument was rejected on the theory that the twenty year history of collective bargaining between the parties made it reasonable to assume that another contract would have been negotiated. Second, relying on the twenty year history of collective bargaining and on the pattern of modern labor-management relations, the Court projected the twenty year figure into the future and calculated future loss of union dues at $23,760.00. The damages awarded in this regard were calculated specifically on the basis of loss of future dues extending beyond the term of the agreement in effect.

The Supreme Court has within the past year had occasion to affirm the precise principle and concept imbedded in the Zdanok case. In John Wiley & Sons Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898, it affirmed that rights, such as seniority, severance pay, etc., can survive the term of the contract from which they derive. The synopsis of the case from the U. S. Supreme Court Reports, Lawyers' Edition, is given in full:

A labor union entered into a collective bargaining agreement with a corporate employer. During the term of the contract, which did not contain an express provision making it binding on successors of the employer, the employer merged with another larger corporation, none of whose employees were represented by a union. Most of the employees of the corporation so merged were transferred to the plant of the successor corporation. The present action was instituted in the District Court for the Southern District of New York by the union to compel the successor corporation to arbitrate under the bargaining agreement disputes as to the effect of the merger on the bargaining agreement and on the rights under it of those covered employees hired by the successor corporation. The District Court refused relief ([Livingston v. John Wiley & Sons Inc., D.C.] 203 F.Supp. 171), but the Court of Appeals reversed and directed arbitration ([Livingston v. John Wiley & Sons Inc., 2 Cir.,] 313 F.2d 52).

On certiorari, the United States Supreme Court affirmed the judgment of the Court of Appeals. In an opinion by Harlan, J., expressing the unanimous views of the Court —Goldberg, J., not participating— it was held that (1) the arbitration provisions of the agreement survived so as to be operative against the

successor corporation; (2) the demands of the union, embracing post-merger claims and claims relating to a period beyond the term of the agreement, were not so plainly unreasonable that the subject matter of the dispute must be regarded as nonarbitrable; and (3) the arbitrator, not the court, was the appropriate body to decide whether procedural prerequisites conditioning, under the agreement, the duty to arbitrate, had been met.

As regards the survival of rights beyond the term of the agreement, Justice Harlan, writing the opinion for a unanimous court, stated at pages 554–555, 84 S.Ct. at page 917:

It is true that the Union has framed its issues to claim rights not only 'now'—after the merger but during the term of the agreement—but also after the agreement expired by its terms. Claimed rights during the term of the agreement, at least, are unquestionably within the arbitration clause; we do not understand Wiley to urge that the Union's claims to all such rights have become moot by reason of the expiration of the agreement. As to claimed rights 'after January 30, 1962,' it is reasonable to read the claims as based solely on the Union's construction of the Interscience agreement in such a way that, had there been no merger, Interscience would have been required to discharge certain obligations notwithstanding the expiration of the agreement. We see no reason why parties could not if they so chose agree to the accrual of rights during the term of an agreement *and their realization after the agreement had expired.*

The Second Circuit Court of Appeals, which decided the original Zdanok v. Glidden case, in 327 F.2d 944 (1964), had occasion to review the propriety of its earlier decision in the light of the extensive impact its decision had in the field of labor law in regard to the extension of seniority rights beyond the term

of particular contracts. The court referred to the fact that the employer cited the same cases it had relied on earlier, including the Elder case and related cases, cases which were also cited by the dissent in the original Zdanok decision as the basis of the dissent, and it noted that "great amount of critical discussion in the law reviews that our decision has engendered," citing in a footnote seven law review articles, seven law notes, and three published panel discussions—but adhered to its earlier decision.

Recent decisions reflect the new concepts recognizing the new realities of steadily evolving labor law. In John Wiley & Sons Inc., v. Livingston, supra, Justice Harlan adverted to some of these distinctions: "While the principles of law governing ordinary contracts would not bind to a contract an unconsenting successor to a contracting party, a collective bargaining agreement is not an ordinary contract. * * * [I]t is a generalized code to govern * * * the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." 376 U.S. at 550, 84 S.Ct. at 914.

Seniority is based on contract—it must be construed by reference to the contract which creates it. The agreement here said:

Seniority * * * shall begin as of the date of employment * * * and shall terminate on the last date of the calendar month in which the employee attains the age of 70 * * * and when that occurs, the provisions *of this agreement* * * shall automatically terminate as to each employee to retire. * * *

In Piercy v. Louisville & N. R. Co., 198 Ky. 477, 248 S.W. 1042, 33 A.L.R 326, the court said:

These seniority rights provided for in interdivisional service are provided for in such an ambiguous, uncertain, and remote manner that we must be driven to a well-known

rule of interpretation in ascertaining what was meant thereby. That rule is that, when the language of a contract is so remote, uncertain, and ambiguous as that its meaning may not be readily discerned, the courts, in interpreting it, will give to it such meaning as the parties themselves have given to it in operating or acting under it, and we may, without exaggeration, say there is, in interpreting such ambiguous writings, no safer rule for the courts to follow.

In the case at bar there is no ambiguity in the language of the agreement on the matter of seniority. The agreement states one fundamental contingency regarding the vesting of seniority—that he enter the service of the company by employment. Rule 15 states once an employee has been in the service for 60 days he cannot be disciplined or dismissed without a hearing, etc.

Rule 14 is the only statement in the agreement on how seniority can be lost or terminated other than by retirement at age 70. It states that "when an employee leaves the service of the company of his own accord, he forfeits all seniority rights. If discharged, he forfeits all rights previously held unless reinstated within 90 days, or his case is pending on appeal as per Rule 15."

In Wicker v. Hoppock, 73 U.S. (6 Wall.) 94, 18 L.Ed. 752, the Supreme Court stated a rule for damages that is applicable here:

The general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the same situation he would have occupied if the wrong had not been committed.

To be applied is this general rule of damages, the rationale of the latest Federal decisions specifically holding that seniority rights can survive the term of the agreement, and the specific provision in the agreement in this case that seniority "shall begin" with employment and "terminate" at age 70 to the charge by the court:

"Rule 4(a) Seniority of each employee shall begin as of the date of employment in his respective classification, and shall terminate on the last date of the calendar month in which the employee attains the age of 70." Mr. Nettles, did you mean to deny that?

Mr. Nettles: Not the entire provision but the applicability of the reduction in forces.

Court: All right, sir. While they don't deny that these exist, they deny that they are applicable to this particular case.

Employees shall be retired from the service of the company on the last day of the calendar month in which they attain the age of 70, or on October 1, 1954, whichever is later, and when that occurs, the provisions of this agreement, other than that providing for retirement at the age of 70, shall automatically terminate as to each employee so retired. * * *"

It is significant that the agreement specifically provides under Rule 4(a) that employees shall be retired from the service of the company on the last day of the calendar month in which they attain the age of 70, or on October 1, 1954, whichever is later, and when that occurs, (not, *if* that occurs), the provisions of this agreement shall automatically terminate. Note these things: That the parties to the agreement are bargaining for all of the porters in the whole system; the particular clause when implemented will force some members of the craft over 70 to retire on October 1, 1954, which for those affected will be the end of their career. Note that this clause was obviously considered with minute particularity as a specific date

was agreed upon. Note, too, that this clause follows immediately after the first and fundamental statement of when seniority specifically shall begin and when it shall end. The agreement speaks in plain English of seniority ending on *one of two particular dates*—exact dates down to the precise day of the month—either October 1, 1954, or the last day of the calendar month in which each employee attains the age of 70. Under the terms of this agreement, every single porter on the entire ACL system can mark down on the calendar the precise day he will make his last run—October 1, 1954, or the last day of the month when he reaches 70. Fred Thompson was born on April 8, 1921, and giving an accepted, common sense meaning to the terms of the agreement he was working under he could know that, absent dismissal for cause, disability, or death, he would make his last run on April 30, 1991.

█ Then what is the only operative contingency that must be satisfied under this agreement before job security—seniority—attaches: be employed by the company as a porter, make a run in the particular category, survive an unprotected 60 day period, and have his application approved (Rule 15). All of these precedent contingencies or conditions were satisfied by the plaintiff and he thereupon became entitled to the stipulated and bargained for benefits of the seniority provision. There is nothing in any of the earlier cases that even by way of dicta denies the authority of parties to an agreement to provide for certain rights to extend beyond the term of the agreement from which they derive. In fact, the courts that followed the old rule more often than not spoke regretfully of the fact that the parties had not so covenanted and that the plaintiff was unable to point to any such saving provision as appears here.

The Court feels that the damages are dependent on a denial, or deprivation of rights; that the damages, or so much as are not mitigated or potential to mitigation, could, if so found by the jury, follow the deprivation into the future. The denial of the motion for a new trial on this ground is based on the specific provisions of the agreement in this case, the surrounding facts and testimony, and the decisions hereinabove referred to.

## IS THE AMOUNT OF THE VERDICT EXCESSIVE?

It is time that the courts became available as a rational forum to give protection to the individual worker in those situations where he stands through no fault of his own outside of the protective concern of his only protector in the field of labor relations—the union. If the union won't help him, and if management doesn't care to antagonize the union, only the courts can grant relief. And what is to be the measure of that relief under such circumstances—damages for loss of a whole career limited to the annual or biannual period of indefinite period or to date of trial? The answers are so compelling that it seems unnecessary to even pose the questions. Here the amount of damages to date of trial—eight years—is substantial in itself, but it is not just eight years being decided upon.[3]

The Court considers whether there is any other conceivable alternative to that assumption. Assume the agreement is terminated after notice as provided by the Railway Labor Act. Would the railroad dare—or even contemplate discharging or firing any employee or employees not, as they might then contend, protected by any effective agreement? There could be an immediate strike, not only by the employees in that particular craft but by every other employee on every other railroad in the country, because the other crafts would realize that without a united front by all, no man's or group's job would be secure. In fact, in NLRB v. Waterman S. S. Co., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704, the Supreme Court held that the NLRB has

---

3. Circumstances entirely beyond the control of the courts had bearing on the delay.

authority to forbid a wholesale discharge of employees, whose tenure is determinable at will, if the discharge is undertaken to effect a purpose forbidden by the Labor Act.

Would the members themselves abandon established seniority priorities even if the company would cooperate? The simple fact of considering whether or not there is any possibility of any significant change in the railroad seniority system, only serves to reinforce the inference that seniority to a railroad man is permanent; it is his whole life; it has always been the life of railroad men in his lifetime; it is something that he has earned through long years of waiting his turn when waiting his turn meant virtual unemployment, or at best, irregular employment.

The Brooks case awarding damages for loss of union dues 20 years into the future is an example of how the law of damages like all other categories of our law adapts itself to new conditions—to realities.

As the Supreme Court stated in Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265, 266, 66 S.Ct. 574, 580, 90 L. Ed. 652:

'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery' for a proven invasion of the plaintiff's rights.

In the instant case a fairly secure yardstick for measuring the damages was available; there was an eight year period in which fluctuations would tend to average out, and because of the nature of the case, the wage record for the entire period of the man or men "who took the plaintiff's place" was available. In Bigelow, supra, the court sustained a verdict for damages where the case had been submitted to the jury on two theories: "We conclude that there was evidence to support a verdict for damages on at least one theory on which the case was submitted to the jury." In that regard, if the jury's verdict in this case

were construed to be based on the theory of malicious interference with a contractual (employment) relation, the fact that the employment might have been terminable at will would be no bar to the jury awarding substantial damages.

In Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 378, 379, 47 S.Ct. 400, 71 L.Ed. 684, the Supreme Court reaffirmed the general rule as to measure of damages, including the elements to be considered in charging a jury as to future damages where loss of future profits were involved. The test was whether there was "a reasonable basis of computation."

As to this question the Court of Appeals—after stating that in its opinion the plaintiff's evidence would have supported a much larger verdict than that returned by the jury —said: "The plaintiff had an established business, and the future profits could be shown by past experience. It was permissible to arrive at net profits by deducting from the gross profits of an earlier period an estimated expense of doing business. Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." This, we think, was a correct statement of the applicable rules of law. Furthermore, a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. (Citing cases.)

We conclude that plaintiff's evidence as to the amount of damages, while mainly circumstantial, was competent, and that it sufficiently showed the extent of the damages, as a matter of just and reasonable inference, to warrant the submission of this question to the jury. The

jury was instructed, in effect, that the amount of the damages could not be determined by mere speculation or guess, but must be based on evidence furnishing data from which the amount of the probable loss could be ascertained as a matter of reasonable inference. And the question as to the amount of the plaintiff's damages having been properly submitted to the jury, its determination as to this matter is conclusive.

If the admonition of Lincoln Mills require the courts to look first to a comprehensive, uniform federal law in fashioning remedies in the labor relations field, it also permits the courts to look to state law if federal decisions on the point be lacking:

> The range of judicial inventiveness will be determined by the nature of the problem. * * * Federal interpretation of the federal law will govern, not state law. * * * But state law, if compatible with the purpose of § 301 [and, now, the Railway Labor Act under the holdings of International Association of Machinists v. Central Airlines, Inc., and Republic Steel Corp. v. Maddox cited infra], may be resorted to in order to find the rule that will best effectuate the federal policy. * * Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights. [353 U.S. at 457, 77 S. Ct. at 918.]

In this regard, see Martin v. Southern Railway Co., 244 S.C. 315, 136 S.E.2d 907, which involved a wrongful discharge suit by a 62-year-old conductor against the railroad. One of the issues was the contention of the railroad that "[T]he plaintiff's contract of employment was one of indefinite duration terminable at the will of either party and, therefore, plaintiff's discharge afforded no legal basis for complaint." The S. C. Supreme Court held in 136 S.E.2d at 909 that:

> While the term of service of the plaintiff was in some respects indefi-
nite, the agreement between the defendant and the Order of Railway Conductors and Brakemen had the effect of limiting the indefiniteness of the term and the right of the defendant to discharge the plaintiff, with or without cause, by providing, in effect, that the defendant could not discharge an employee without cause, and that it could not discharge one with cause until it had complied with the provisions of the contract * * *.

The plaintiff in this case testified that his gross—1957–58—earnings, exclusive of unemployment compensation, were $500.00. His earnings during 1959, 1960 and through September 29th, 1961, at $40.00 per week from Aiken and Company were $5,720.00. His earnings from September 29, 1961 through December 1, 1964 were $7,523.00. His total earnings from January 1957 to December 1964 were $13,743.00. The earnings of R. A. Anderson, the porter with comparable seniority, for the period starting with the year 1957 through October 31, 1964 were $44,473.07. The difference between what Thompson earned and what Anderson earned amounting to $30,730.00 or more than $3,700.00 difference each year. The $30,730.00 represents the difference only to the date of trial. At the time of trial Thompson was 43 years old. Projecting the $3,700.00 per year difference either on the basis of Thompson's life expectancy or until he reached the mandatory retirement age of 70 would amount to an additional sum in excess of $100,000.00, so that the actual verdict of $56,500.00 was reasonable on the basis of the testimony and earning records introduced in evidence. In light of all the evidence, it is neither "shocking" or "excessive". The jury has spoken quite reasonably.

Plaintiff's livelihood was indelibly attached to his chosen career. He must have known the trade as his earnings were responsive. On his seniority, as the jury found, depended his wage. Seniority, job, wages—all were of precious right to him as a laboring man. The

jury found his loss of them were attributable to wrongs by defendant.

The verdict of the jury was reasonably and soundly based on testimony and exhibits. The defendant's motion for a new trial or judgment N.O.V. should be denied.

And it is so ordered.