Fred **THOMPSON**, Appellee,

v.

**BROTHERHOOD OF SLEEPING CAR PORTERS**, an Unincorporated Railroad Labor Organization, National in Scope, Appellant.

No. 10251.

United States Court of Appeals
Fourth Circuit.

Argued March 9, 1966.

Decided Sept. 14, 1966.

Joseph L. Nettles, Columbia, S. C. (Ernest Fleischman, and Delson & Gordon, New York City, on brief), for appellant.

Richard G. Dusenbury and Bernard D. Dusenbury, Florence, S. C. (Dusenbury, Dusenbury & McKenzie, Florence, S. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Circuit Judge.

This action for damages against a union for breach of its duty of fair representation came before this court initially on review of a directed verdict in favor of the defendant union, granted at the close of the plaintiff's case. In that posture, after reviewing the complaint and the plaintiff's evidence, we concluded that the plaintiff had stated a cause of action. We held that the union could not be relieved of liability as a matter of law, and held that the evidence raised an issue that should have been resolved by the fact

finder after hearing defense testimony. 316 F.2d 191 (4th Cir. 1963).[1]

On remand, the District Court, sitting with a jury, gave judgment for the plaintiff in the amount of $56,500, representing losses incurred by the plaintiff to the date of judgment and also losses which he will suffer in the future. 243 F.Supp. 261 (E.D.S.C.1965). On this appeal the union attacks the judgment principally on two grounds: first, that its motion for a judgment n. o. v. should have been granted because there is no evidence to support a jury determination of liability; and second, that future damages are not recoverable.[2]

## I

Thompson alleged that because he was not a union member, the Brotherhood of Sleeping Car Porters failed to espouse his claim to mail porter seniority during the years 1950 through 1956, and that as a result of this misconduct of the union he lost his job as an employee of the Atlantic Coast Line Railroad Company. We agree with the District Court that there was substantial evidence which, if accepted by the jury, would warrant recovery. See also Hiller v. Liquor Salesmen's Union Local No. 2, 338 F.2d 778 (2d Cir. 1964); Gainey v. Brotherhood of Railway and Steamship Clerks, 230 F.Supp. 678 (E.D. Pa.1964). Much of the evidence favorable to the plaintiff was narrated by this court in its first opinion, and need only be summarized here.

Thompson was first employed by the railroad in 1946, working off the "extra board" as a mail porter and a train porter. Under the 1944 agreement, then in effect between the Brotherhood and the Railroad,[3] the latter published separate sen-

iority rosters on January 1 of each year for train porters, mail porters, and chair car attendants. The contract provided that the seniority of each employee should begin as of the date of employment in his respective classification, and that changes in seniority rosters would not be made except upon protest filed within 60 calendar days from the date of posting.

On January 1, 1947, Thompson appeared on the *train porter* seniority roster, with seniority dating from January 18, 1946, but his name did not appear on the *mail porter* roster until January 1, 1957, when he was listed as the tenth and last man, with seniority dating from October 22, 1956. Until 1953 or 1954, the train porter's job was preferred by the employees to that of mail porter, but thereafter it became apparent that the company intended to eliminate the train porter classification, and in fact Thompson's position as train porter was abolished in 1956. Because of his junior position on the mail porter list, Thompson was unable to obtain any mail porter runs, and in 1957 or 1958 he began to receive unemployment compensation.

In 1950, Thompson protested for the first time the omission of his name from the mail porter seniority list and reiterated his claim with the publication of each successive seniority roster through 1956. His first written protest in which he claimed seniority dating from 1948, was registered in 1953. Thompson concedes that he might not be entitled to seniority as a mail porter before 1950, because of his failure to protest until that year, but contends that the jury could properly have concluded that he was entitled to seniority, if not on the 1950 ros-

---

1. The views of this court on the general legal issues were again outlined in Rumbaugh v. Winifrede R. Co., 331 F.2d 530 (4th Cir.), cert. denied, 379 U.S. 929, 85 S.Ct. 322, 13 L.Ed.2d 341 (1964). Cf. Humphrey v. Moore, 375 U.S. 335, 351, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964) (Justice Goldberg concurring). See generally, Rosan, Fair Representation, Contract Breach, and Fiduciary Obligations: Unions, Union Officials and the Worker

in Collective Bargaining, 15 Hastings L.J. 391 (1964).

2. The original briefs filed by the parties were of little aid to the court. At oral argument we requested supplemental briefs which were later submitted to us.

3. The agreement did not contain a union shop clause. The subsequent 1954 collective agreement does not differ substantially in any of the provisions here pertinent.

ter, at least on the 1953 roster. Since Thompson made mail porter runs, as well as train porter runs, from 1950 through 1953, the jury could well have accepted plaintiff's contention that he was entitled to the fourth, if not the third, position on the mail porter seniority roster.[4]

The union contends that Thompson was not entitled to mail porter seniority during any of the years in question because, as a regular train porter with train porter seniority, he was required to protect his train porter run and could not acquire seniority in both classifications. We, however, agree with the District Court that the jury could take a contrary view.

This position is supported by a comparison of the 1953 train porter seniority list with the 1953 mail porter seniority list, which reveals that two employees were accorded seniority in both classifications.[5]

In May and October of 1956, union and company representatives met, with Thompson in attendance, to discuss his status as a mail porter. The company expressed its willingness to list Thompson on the mail porter roster in any position to which the union would agree. The union replied that it would agree to list Thompson with seniority as of 1953, if those employees who had been granted seniority subsequent to 1953 would ac-

---

4. The Seniority List of Mail Porters as of January 1, 1957, reads as follows:

| | Name | Date Entered Service | Porter's Seniority |
|---|---|---|---|
| 1. | A. J. Pringle | 5/29/43 | 10/10/43 |
| 2. | J. G. Reed | 8/15/45 | 12/18/47 |
| 3. | R. A. Anderson | 11/15/50 | 11/15/50 |
| 4. | Amos Maxwell | 11/10/52 | 11/10/52 |
| 5. | Joe Singletary, Jr. | 10/14/55 | 10/14/55 |
| 6. | Walter Fulton, Jr. | 12/ 6/55 | 12/ 6/55 |
| 7. | Charles Andrews | 11/ 3/55 | 4/ 7/56 |
| 8. | James H. Thomas | 8/18/56 | 8/18/56 |
| 9. | Mike Curry | 9/19/56 | 9/19/56 |
| 10. | Fred N. Thompson | 10/22/56 | 10/22/56 |

Amos Maxwell first appeared on the seniority roster of July 1, 1953, a supplement to the January, 1953, roster, with seniority dating back to November 10, 1952. Because Thompson worked as mail porter during 1952 and protested the omission of his name from the January, 1953, roster, the jury would have been warranted in finding that Thompson should have been listed on the January, 1953, roster, ahead of Maxwell.

---

5. Seniority List of Train Porters—January 1, 1953:

| | Name | Date Entered Service | Porter's Seniority |
|---|---|---|---|
| 1. | Mike Curry | 2/ 3/33 | 9/15/42 |
| 2. | Robert Price | 1/ 1/37 | 12/26/43 |
| 3. | Glaster Simon | 1/ 1/31 | 9/19/44 |
| 4. | Fred N. Thompson | 1/18/46 | 1/18/46 |
| 5. | *J. G. Reed* | 8/15/45 | 12/18/47 |
| 6. | *R. A. Anderson* | 11/15/50 | 11/15/50 |

Seniority List of Mail Porters—January 1, 1953:

| | Name | Date Entered Service | Porter's Seniority |
|---|---|---|---|
| 1. | A. J. Pringle | 5/29/43 | 10/10/43 |
| 2. | *J. G. Reed* | 8/15/45 | 12/18/47 |
| 3. | *R. A. Anderson* | 11/15/50 | 11/15/50 |
| 4. | Amos Maxwell | 11/10/52 | 11/10/52 |

quiesce in their being made junior to Thompson. Those employees, naturally, did not acquiesce, and Thompson was listed on the 1957 roster as having seniority only from October 22, 1956, the date of the October meeting.

Thompson was not a regular, dues-paying union member. He became associated with the union for a brief period sometime in 1951 or 1952, but later withdrew because, as he testified, the union did not vigorously press his claim for seniority. He rejoined the Brotherhood in 1956, at a time when the company was phasing out his train porter position.

Before the 1956 meetings, B. F. McLaurin, International Field Organizer of the Brotherhood, addressed a letter to Thompson, dated May 8, 1956:

> "*I am sure you were aware that there was nothing I could do until you became a full fledged member; now that you have followed through on your responsibility, rest assured that we will do the same at this end.* I have instructed your local chairman to request a formal hearing on your case. I trust that you will cooperate in every way possible to get this case started in order that we may be able to process it into the Railroad." (Emphasis supplied.)

Coupled with the testimony of A. J. Pringle, former Secretary-Treasurer of the Local, that Thompson could not expect the strong support of the Brotherhood unless he were a member in good standing, McLaurin's letter is more than sufficient to require submission of the question of unlawful discrimination to the jury.[6]

The union argues that even if it discriminated against Thompson, he still would not be entitled to seniority dating from 1953, because it was not until October, 1956, that he modified his demand

for seniority dating from 1948, by substituting the 1953 date as an alternative. We are of the opinion that the evidence permitted a jury finding that the union, possessing complete knowledge of Thompson's position from 1950 through 1956, breached its obligation by not seeking for him in 1953 seniority as of that year, even though Thompson himself then thought that he was entitled to seniority as of 1948. From our reading of the record we also think that it was a jury question whether the union in 1956 should have supported Thompson's claim for seniority as of 1953, despite the fact that other employees on the mail porter seniority list—even members of the union—would thereby have become junior to Thompson.

## II

We turn now to the award of damages. Of the $56,500 that the jury awarded, the District Court determined, upon an analysis of the evidence which appears to be well supported, that $30,730 represented compensation to the plaintiff for losses in income from the end of 1956, when Thompson's train porter job was eliminated, to December, 1964, the date of the verdict.

The court reasoned that if Thompson had been fairly represented by the union he would have made runs substantially similar to those made by R. A. Anderson, who is third on the 1957 seniority list for mail porters. During the period from 1957 through 1964, Anderson earned a total of $44,473.07, while Thompson's earnings during the same period amounted to only $13,743, $30,730.07 less than Anderson's. We think that it was within the lawful discretion of the jury to use the comparison between Thompson's and Anderson's earnings to arrive at Thompson's loss of wages, and that $30,730 is not an unreasonable figure as the measure of past damages.

6. Another revealing letter from McLaurin, dated November 23, 1954, and addressed to all train porters, contains the following language:
    "It is a well-known fact that porters are off their jobs today who ordinarily would be working if they had been members in good standing in the organization."

In affirming the total amount of the jury's verdict, the court said:

> "At the time of trial Thompson was 43 years old. Projecting the $3,700.00 per year difference either on the basis of Thompson's life expectancy or until he reached the mandatory retirement age of 70 would amount to an additional sum in excess of $100,000.00, so that the actual verdict of $56,500.00 was reasonable on the basis of the testimony and earning records introduced in evidence." 243 F.Supp. at 275.

Thus, $25,770 was judged a reasonable measure of Thompson's future losses.[7]

 We are of the opinion that the District Court did not abuse its discretion in refusing to set aside the jury's verdict. Appellant objects to the allowance of any damages for future losses on the ground that they are too speculative. The propriety of an award for future losses, however, is implicit in the decisions of the Supreme Court in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) and Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1956). *Wiley* establishes that seniority rights do not necessarily terminate at the expiration of the collective bargaining agreement. *Lincoln Mills* mandates the federal courts to fashion effective remedies for the impairment of federally created rights in the field of labor relations. Since neither the plaintiff nor the defendant saw fit to make the railroad a party to this action, the only effective remedy is a damage award for the loss of past and future earnings. Although Thompson's loss of future earnings cannot be established with absolute precision, we agree with the District Court's conclusion that the jury's verdict provides a reasonably accurate measure and appears to have taken into account factors which might operate in mitigation of the loss. An injured party is not barred from a reasonable recovery merely because he is unable to prove his damages with absolute certainty. See Zdanok v. Glidden Co., 288 F.2d 99, 104, 90 A.L.R.2d 965 (2d Cir. 1961), aff'd, 370 U.S. 530, 82 S. Ct. 1459, 8 L.Ed.2d 671 (1962). Moreover, no issue as to the amount awarded for future losses has been raised in the briefs, oral arguments or supplemental memoranda, and upon consideration of the entire case we find no basis for disturbing the judgment.

Affirmed.

---

7. The Complaint did not request punitive damages, and the District Judge's charge to the jury specifically limited its consideration to compensatory damages: "The only question of damages in this case is a question of what is known as actual damages and actual damages are compensatory damages. That is what he lost or what he suffered." 243 F.Supp. at 266. Cf. Brady v. Trans World Airlines, Inc., 196 F.Supp. 504, 506 (D.Del.1961); 223 F.Supp. 361, 370 (D.Del.1963).