## INTERNATIONAL ASSOCIATION OF MACHINISTS, AFL–CIO, ET AL. v. CENTRAL AIRLINES, INC.

No. 61. Argued February 19–20, 1963.—Decided April 15, 1963.

*Charles J. Morris* and *Bernard Dunau* argued the cause for petitioners. With them on the briefs was *Plato E. Papps.*

*Luther Hudson* argued the cause and filed a brief for respondent.

*Samuel J. Cohen* filed a brief for the Air Line Pilots Association, as *amicus curiae,* urging reversal.

MR. JUSTICE WHITE delivered the opinion of the Court.

The respondent airline discharged the six individual petitioners in April 1958 after they refused to attend disciplinary hearings without having a union representative present. The petitioning union and the employees ini-

tiated grievances over these discharges, which were not settled between the parties and which were presented to the system board of adjustment, established by agreement between the union and the airline according to the Railway Labor Act, 44 Stat. 577, as amended, 45 U. S. C. §§ 151–188. The four-man board of adjustment deadlocked, a neutral referee was appointed by the National Mediation Board, and an award was then rendered ordering the individual petitioners reinstated without loss of seniority and with back pay. Central refused to comply and petitioners filed this suit in the United States District Court for the Northern District of Texas for enforcement of the award.

The complaint recited the certification of the union as the collective bargaining agent by the National Mediation Board pursuant to an election held under the Railway Labor Act, disclosed the execution of a collective bargaining contract with the company, and attached as an exhibit a copy of another contract with Central establishing a system board of adjustment. This contract stated, "In compliance with Section 204, Title II of the Railway Labor Act, as amended, there is hereby established a system board of adjustment for the purpose of adjusting and deciding disputes . . . ." Under the express terms of the contract, "decisions of the Board in all cases properly referable to it shall be final and binding upon the parties" and, when a neutral referee is sitting with the board, "a majority vote of the Board shall be final, binding, and conclusive between the Company and the Association and anyone they may represent having an interest in the dispute." The complaint set out in some detail the action and decision of the system board and a copy of its award was attached. Alleging that Central had refused to comply with the terms of the award and that the suit "arises under the laws of the United States, specifically

under the Railway Labor Act as set out more particularly hereinabove," petitioners requested the "enforcement of the aforesaid System Board Award . . . and that judgment be entered ordering defendant to comply with said award . . . ."

Although the gist of the complaint was that Central was obliged to comply with the award by reason of the Railway Labor Act, the District Court granted Central's motion to dismiss for lack of jurisdiction, concluding that there was no diversity of citizenship (which was not disputed) and that the case did not arise under the laws of the United States as required by 28 U. S. C. § 1331.[1] The Court of Appeals for the Fifth Circuit affirmed on the authority of its previous decision in *Metcalf* v. *National Airlines*, 271 F. 2d 817, ruling that the complaint did not disclose "affirmatively a federally-created cause of action" and that "this suit is nothing more than a state-created action to construe a contract." 295 F. 2d 209. Certiorari was granted to consider the important question of whether a suit to enforce an award of an airline system board of adjustment is a suit arising under the laws of the United States under 28 U. S. C. § 1331 or a suit arising under a law regulating commerce under 28 U. S. C.

---

[1] 28 U. S. C. § 1331:

"(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

"(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff."

§ 1337.[2]  369 U. S. 802.  We have concluded that this question must be answered in the affirmative and that the District Court has jurisdiction to proceed with the suit.

## I.

In 1936, Congress extended the Railway Labor Act to cover the then small-but-growing air transportation industry.  49 Stat. 1189, 45 U. S. C. §§ 181–188.  Its general aim was to extend to air carriers and their employees the same benefits and obligations available and applicable in the railroad industry.[3]  But there was to be a significant variation.  The 1936 amendments made applicable to the airlines all of the provisions of the Railway Labor Act, excepting § 3, 45 U. S. C. § 153, dealing with the National Railroad Adjustment Board; but including § 1, 45 U. S. C. § 151, containing definitions; § 2, 45 U. S. C. § 151a, the Act's statement of purposes; §§ 4 and 5, 45 U. S. C. §§ 154–155, relative to the National Mediation Board and its functions; and §§ 7, 8 and 9, 45 U. S. C. §§ 157–159, relating to voluntary arbitration and emergency boards.  § 202, 45 U. S. C. § 182.  In the place of § 3, Congress provided in § 205, 45 U. S. C. § 185, that the creation of a National Air Transport Board would

---

[2] 28 U. S. C. § 1337:

"The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

Petitioners' complaint mentioned only § 1331, but reliance has subsequently been placed on § 1337 as well, since there is a dispute concerning the existence of the jurisdictional amount required by § 1331.  This is permissible.  *American Federation of Labor* v. *Watson,* 327 U. S. 582, 589–591.

[3] See Hearings on S. 2496 before a Subcommittee of the Senate Committee on Interstate Commerce, 74th Cong., 1st Sess. 26–27.

be postponed until "in the judgment of the National Mediation Board, it shall be necessary to have a permanent national board of adjustment . . . ." Until the establishment of the national board for the airlines industry, § 204, 45 U. S. C. § 184, required the formation of system, group, or regional boards of adjustment:

> "It shall be the duty of every carrier and of its employees, acting through their representatives, selected in accordance with the provisions of sections 181–188 of this title, to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 153 of this title."

The duty imposed upon the parties to create adjustment boards to settle grievances was more than a casual suggestion to the air industry. The original version of S. 2496, which, as amended, became law, provided for voluntary boards of adjustment as in the case of the railroads and extended the jurisdiction of the National Mediation Board to minor as well as major disputes.[4] But upon the suggestion of the National Mediation Board, its jurisdiction was not expanded, and the law as finally passed made compulsory the establishment of the adjustment boards.[5] Until and unless the National Mediation Board determined to create a national board, the parties were placed under the statutory duty of establishing and utilizing system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes arising under existing contracts.

The obligation which § 204 fastened upon the carriers and their employees cannot be read in isolation. Its true significance must be drawn from its context as part of the

---

[4] *Id.*, at 1–2.
[5] *Id.*, at 11.

Railway Labor Act which itself draws meaning from its history.[6] See *Romero* v. *International Term. Co.*, 358 U. S. 354, 360.

Congress has long concerned itself [7] with minimizing interruptions in the Nation's transportation services by strikes and labor disputes and has made successive attempts to establish effective machinery to resolve disputes not only as to wages, hours, and working conditions, the so-called major disputes connected with a negotiation of contracts or alterations in them, but also as to the interpretation and application of existing contracts, the minor disputes of the type involved in this case. In 1920,[8] the latter category was dealt with by providing that the parties "may" create boards of adjustment to handle these grievances which, however, if unresolved by these boards were to be referred to the Railway Labor Board whose decisions were not legally enforceable.[9] The results were highly unsatisfactory,[10] and in 1926 Congress required that "boards of adjustment shall be created by agreement." [11] The boards were to be composed of an equal number of employee and employer representatives and

---

[6] See generally *Virginian R. Co.* v. *System Federation*, 300 U. S. 515; *Texas & N. O. R. Co.* v. *Brotherhood of Railway Clerks*, 281 U. S. 548; Garrison, The National Railroad Adjustment Board, 46 Yale L. J. 567; Note, 72 Yale L. J. 803.

[7] The Court has many times reviewed the history of the railway labor laws. For example, see *Elgin, J. & E. R. Co.* v. *Burley*, 325 U. S. 711; *Slocum* v. *Delaware, L. & W. R. Co.*, 339 U. S. 239; *Brotherhood of Trainmen* v. *Chicago R. & I. R. Co.*, 353 U. S. 30; *Union Pac. R. Co.* v. *Price*, 360 U. S. 601; *Machinists* v. *Street*, 367 U. S. 740.

[8] 41 Stat. 469, 474.

[9] *Pennsylvania Federation* v. *Pennsylvania R. Co.*, 267 U. S. 203. See *Pennsylvania R. Co.* v. *Labor Board*, 261 U. S. 72.

[10] See *Brotherhood of Trainmen* v. *Chicago R. & I. R. Co.*, 353 U. S. 30.

[11] 44 Stat. 578.

their decisions were to "be final and binding on both parties to the dispute; and it shall be the duty of both to abide by such decisions." [12]

In spite of the mandate of the 1926 Act, creation of adjustment boards did not automatically follow. Furthermore, there was no provision in the Act for breaking deadlocks of the board, which were frequent and which resulted in a myriad of minor disputes going unresolved. As a result, see *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 725–726, in 1934 the Act was amended to create the National Railroad Adjustment Board, the divisions of which were to hear disputes referred by either party and "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." § 3, 45 U. S. C. § 153 First (i). In the event of deadlocks in a division, the National Mediation Board was required to name a neutral referee to sit with the appropriate division of the Board to determine the case. § 3 First (1). It was provided in § 3 First (m) that "the awards of the several divisions of the Adjustment Board shall be stated in writing . . . and the awards shall be final and binding upon both parties to the dispute, except insofar as they shall contain a money award. . . ." Section 3 First (p) provided for a suit in the United States District Courts to enforce certain awards.

While thus establishing a National Adjustment Board with power to make final awards with the help of neutral persons where necessary, Congress also provided in § 3 Second for voluntary system boards:

> "Nothing in this section shall be construed to prevent any individual carrier, system, or group of carriers and any class or classes of its or their employees,

---

[12] § 3 First (e), *id.,* at 579.

all acting through their representatives, selected in accordance with the provisions of this chapter, from mutually agreeing to the establishment of system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes of the character specified in this section. In the event that either party to such a system, group, or regional board of adjustment is dissatisfied with such arrangement, it may upon ninety days' notice to the other party elect to come under the jurisdiction of the Adjustment Board." 45 U. S. C. § 153 Second.

This machinery was designed to serve the stated purposes of the Act which were, among others: "To avoid any interruption to commerce or to the operation of any carrier engaged therein" and "to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." § 2, 45 U. S. C. § 151a. Implementing such goals, § 2 First, 45 U. S. C. § 152 First, made it "the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements . . . and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce." The statute directed that minor disputes be handled on the property in the usual manner, but failing adjustment either party could take the matter to the adjustment board, which was to hear and decide it. This provision is applicable both to rail (§ 3 Second) and air (§ 204) carriers.

## II.

In view of the clearly stated purposes of the Act and of its history, reflecting as it does a steady congressional

intent to move toward a reliable and effective system for the settlement of grievances, we believe Congress intended no hiatus in the statutory scheme when it postponed the establishment of a National Air Transport Adjustment Board and instead provided for compulsory system, group, or regional boards. Although the system boards were expected to be temporary arrangements, we cannot believe that Congress intended an interim period of confusion and chaos or meant to leave the establishment of the Boards to the whim of the parties. Instead, it intended the statutory command to be legally enforceable in the courts and the boards to be organized and operated consistent with the purposes of the Act.

We have held other duties imposed upon the carriers and their employees by the Railway Labor Act binding and their breach redressable in the federal courts, such as the duty to bargain, *Virginian R. Co.* v. *System Federation,* 300 U. S. 515, 545, and the duty of a certified bargaining representative to represent all members of the craft without discrimination, *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192.[13] We take a similar view of the duty to establish adjustment boards under § 204; and as the Court said in *Tunstall* v. *Brotherhood of Locomotive Enginemen,* 323 U. S. 210, 213, quoting from *Deitrick* v. *Greaney,* 309 U. S. 190, 200–201, "the extent and nature of the legal consequences" of this duty "though left by the statute to judicial determination, are nevertheless to

---

[13] The absence of a specific statute conferring jurisdiction, in addition to §§ 1331 and 1337, was of no moment in such cases. See *Tunstall* v. *Brotherhood of Locomotive Enginemen,* 323 U. S. 210, 213; *Leedom* v. *Kyne,* 358 U. S. 184, 189–190. These cases, and the one at bar, are unlike such cases as *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297, and *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323, where Congress intended no judicial review and its denial impaired no federal rights.

be derived from it and the federal policy which it has adopted." [14]

It is therefore the statute and the federal law which must determine whether the contractual arrangements made by the parties are sufficient to discharge the mandate of § 204 and are consistent with the Act and its purposes. It is federal law which would determine whether a § 204 contract is valid and enforceable according to its terms. If these contracts are to serve this function under § 204, their validity, interpretation, and enforceability cannot be left to the laws of the many States, for it would be fatal to the goals of the Act if a contractual provision contrary to the federal command were nevertheless enforced under state law or if a contract were struck down even though in furtherance of the federal scheme. [15] The

---

[14] See also *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297; *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323; *General Committee* v. *Southern Pac. Co.,* 320 U. S. 338; *Brotherhood of Clerks* v. *United Transport Service Employees,* 320 U. S. 715, 816; *Texas & N. O. R. Co.* v. *Brotherhood of Railway Clerks,* 281 U. S. 548; *Virginian R. Co.* v. *System Federation,* 300 U. S. 515.

[15] As the dissenting judge below remarked, 295 F. 2d, at 221–222: ". . . Congress in 1936 could not . . . have thought that stability and continuity to interstate air commerce would come from the undulating policies . . . of the legislatures and courts (or both) of 48 states in the enforcement of anything thought so essential to industrial peace as this system of governmentally compelled arbitration." The dissenting opinion also points out the difficult conflict of laws problems which applying state law would raise, 295 F. 2d, at 223:

"Not the least of the absurdities is that an airplane flies from state to state. What state is to be the forum? What state was the parent of this creature—the consensual contract containing the agreement to arbitrate? May any or all of the states beneath the route or routes traveled by the airline be resorted to? Is the continuity of essential air traffic to be at the plaintiff's choice of forum? What is to happen when several plaintiffs bring several suits in several

needs of the subject matter manifestly call for uniformity.[16] Compare *Teamsters Union* v. *Lucas Flour Co.,* 369 U. S. 95, 103–104.

The contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy. If any provision contained in a § 204 contract is enforceable, it is because of congressional sanction: "[T]he federal statute is the source of the power and authority . . . . The enactment of the federal statute . . . is the governmental action . . . though it takes a private agreement to invoke the federal sanction. . . . A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it . . . ." *Railway Dept.* v. *Hanson,* 351 U. S. 225, 232. That is, the § 204 contract, like the Labor Management Relations Act § 301 contract, is a federal contract and is therefore governed and enforceable by federal law, in the federal courts. The situation presented here is analogous to that in *American Surety Co.* v. *Shulz,* 237 U. S. 159, a suit on a supersedeas bond in an appeal from a District Court to the Court of Appeals. When the judgment against the appellant was affirmed and he failed to pay it, the appellee sued the surety in the District Court. This Court held that there was "arising under" jurisdiction, since the bond had been given pursuant to the federal statute requiring one when appeals

states? Is effective federal control of an operational activity deemed so essential to national welfare to be precariously dependent upon the accident of diversity of citizenship?"

[16] To be sure, different airlines may use different contracts, and any one may have different agreements for different crafts, but such lack of uniformity represents a minimal burden on commerce. The lack of uniformity created by dividing everything by 50 (or however many States the system spans) would multiply the burden by a substantial factor and aggravate the problem to an intolerable degree.

were taken; the construction of the bond and the extent of the surety company's liability under it were said to be federal questions which the federal courts had jurisdiction to determine.[17]

[17] The *Shulz* case followed a line of authority involving suits on bonds given by federal officers to ensure their faithful performance of their federal duties, in which the Court had held that there was federal jurisdiction for suits by an aggrieved party seeking to collect from the surety. *Bock* v. *Perkins,* 139 U. S. 628 (suit for tort of U. S. marshal committed in performance of duty); *Sonnentheil* v. *Moerlein Co.,* 172 U. S. 401 (same); see *Feibelman* v. *Packard,* 109 U. S. 421 (same, removal case); *Howard* v. *United States,* 184 U. S. 676 (suit against surety of clerk of court brought *ex rel.* United States to recover for clerk's appropriation of money paid into federal court). The same rule that federal law applies to federal contracts has been applied, in a choice of substantive law rather than jurisdictional context, in cases involving rights and obligations arising on commercial paper issued by the United States. See, *e. g., Metropolitan Bank* v. *United States,* 323 U. S. 454; *Clearfield Trust Co.* v. *United States,* 318 U. S. 363, 366. See also *Royal Indem. Co.* v. *United States,* 313 U. S. 289, 296 (general law rather than local law governs whether Government may collect interest on surety bond given to secure collection of taxes); *American Pipe & Steel Corp.* v. *Firestone Co.,* 292 F. 2d 640, 643–644 (C. A. 9th Cir.) (construction of subcontract governed by federal law in suit between prime and sub on government contract); *Girard Trust Co.* v. *United States,* 149 F. 2d 872 (C. A. 3d Cir.) (federal law governs rights of parties in lease where Government is lessee, Tucker Act suit); *Woodward* v. *United States,* 167 F. 2d 774 (C. A. 8th Cir.) (federal law governs interpretation of National Service Life Insurance policy, suit against Government on policy). Although these decisions did not involve federal jurisdiction as such, since jurisdiction was conferred by specific statutes and recourse to the "arising under" statute was unnecessary, they are suggestive since they hold federal law determinative of the merits of the claim. Also highly suggestive, for the same reason, is this Court's language in *Sola Elec. Co.* v. *Jefferson Elec. Co.,* 317 U. S. 173, 176, a case involving both federal patent-antitrust policies and conflicting state contract law policies of estoppel:

"[T]he doctrine of that case [*Erie*] is inapplicable to those areas of judicial decision within which the policy of the law is so domi-

More specifically, the provisions of a § 204 contract, such as those governing the composition of the adjustment board, the procedures to be employed as to notice and hearing or for breaking deadlocks, or the finality to be accorded board awards, are to be judged against the Act and its purposes and enforced or invalidated in a fashion consistent with the statutory scheme.[18] There may be, for example, any number of provisions with regard to the finality of an award that would satisfy the requirements of § 204 but we are quite sure that *some* such provision is requisite to a § 204 contract and that the federal law would look with favor upon contractual provisions affording *some* degree of finality to system board awards. Congress has long since abandoned the approach of the completely unenforceable award which was used in the 1920 Act. *Elgin, J. & E. R. Co.* v. *Burley, supra.* Adjustment board decisions were expressly made final and binding in

nated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law."

[18] Thus in *cases* involving adjustment board procedures or awards, the federal courts have applied federal substantive law to the determination of the validity of the award and the procedures for securing it, irrespective of whether the case was brought into the federal court system on the basis of diversity. See *International Assn. of Machinists* v. *Northwest Airlines,* 304 F. 2d 206 (C. A. 8th Cir.); *Flight Engineers* v. *American Airlines,* 303 F. 2d 5 (C. A. 5th Cir.); *Woolley* v. *Eastern Air Lines,* 250 F. 2d 86, 90–91 (C. A. 5th Cir.); *Sigfred* v. *Pan American World Airways,* 230 F. 2d 13 (C. A. 5th Cir.); *Bower* v. *Eastern Airlines,* 214 F. 2d 623, 625–627 (C. A. 3d Cir.); *Pan American World Airways, Inc.,* v. *Division of Labor Law Enforcement,* 203 F. Supp. 324 (N. D. Cal.); *Edwards* v. *Capital Airlines,* 84 U. S. App. D. C. 346, 176 F. 2d 755; *Crusen* v. *United Air Lines,* 141 F. Supp. 347 (D. Colo.), aff'd, *per curiam,* 239 F. 2d 863 (C. A. 10th Cir.); *Farris* v. *Alaska Airlines,* 113 F. Supp. 907 (W. D. Wash.); *American Airlines* v. *Air Line Pilots Assn.,* 91 F. Supp. 629 (E. D. N. Y.); *United Automobile Workers* v. *Delta Air Lines,* 83 F. Supp. 63 (N. D. Ga.).

the 1926 Act, the National Railroad Adjustment Board awards were made enforceable in the federal courts by the 1934 amendments, and the awards under voluntary arbitration agreements were likewise made expressly enforceable by the statute. There is no reason to believe that in 1936 Congress discarded for an entire industry an element essential to a reliable system of settling disputes under existing contracts or that it contemplated awards by adjustment boards the enforceability of which depended entirely upon the desires of the parties or upon state statutes or court decisions. Quite the contrary, the Act, its history, and its purposes lead us to conclude that when Congress ordered the establishment of system boards to hear and decide airline contract disputes, it "intended the Board to be and to act as a public agency, not as a private go-between; its awards to have legal effect, not merely that of private advice." *Bower* v. *Eastern Airlines*, 214 F. 2d 623, 626 (C. A. 3d Cir.); *Washington Term. Co.* v. *Boswell*, 75 U. S. App. D. C. 1, 10, 124 F. 2d 235, 244.

## III.

The contract of the parties here was executed under § 204 and declares a system board award to be final, binding, and conclusive. The claim stated in the complaint is based upon the award and demands that it be enforced. Whether Central must comply with the award or whether, instead, it is impeachable, are questions controlled by federal law and are to be answered with due regard for the statutory scheme and purpose. To the extent that the contract imposes a duty consistent with the Act to comply with the awards, that duty is a federal requirement. If Central must comply, it is because federal law requires its compliance.

In the circumstances we have here, we are not dealing with a suit involving an aspect of federal law which is only collateral or remote or a case where state and federal

laws are so blended as to present a serious question of the scope of the arising-under provision of § 1331 or § 1337. See *Smith* v. *Kansas City Title & Trust Co.*, 255 U. S. 180; *Gully* v. *First Nat. Bank,* 299 U. S. 109; *Skelly Oil Co.* v. *Phillips Petroleum Co.*, 339 U. S. 667; *Romero* v. *International Term. Co.*, 358 U. S. 354, 393, n. 4 (dissenting and concurring opinion). In our view the complaint in this case, for jurisdictional purposes, presented a substantial claim having its source in and arising under the Railway Labor Act and the District Court therefore has jurisdiction under 28 U. S. C. § 1331 if the jurisdictional amount is satisfied and in any case under § 1337. *Romero* v. *International Term. Co.*, 358 U. S. 354; *Montana-Dakota Co.* v. *Northwestern P. S. Co.*, 341 U. S. 246, 249; *American Well Works Co.* v. *Layne & Bowler Co.*, 241 U. S. 257, 260.[19]

*Reversed and remanded.*

---

[19] See also *Brotherhood of Trainmen* v. *Chicago R. & I. R. Co.*, 353 U. S. 30, brought under 28 U. S. C. §§ 1331, 1337. (R. 4, 47.)