**August Paul ROSSI, Plaintiff,**

v.

**TRANS WORLD AIRLINES, Defendant.**

**Civ. No. 72–1347–AAH.**

United States District Court,
C. D. California.

Nov. 13, 1972.

Victor I. Reichman, Norwalk, Cal., for plaintiff August Paul Rossi.

Richard C. White, Gary C. Moss, and Gordon E. Krischer, O'Melveny & Myers, Los Angeles, Cal., for defendant Trans World Airlines.

## OPINION AND ORDER GRANTING MOTION FOR SUMARY JUDGMENT

HAUK, District Judge.

This case comes before the court on a motion by Defendant Trans World Airlines (TWA) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Plaintiff has filed a complaint here in Federal Court against his employer, TWA, following his dismissal from that

corporation. He seeks reinstatement to the position from which he was removed and a judgment for all back pay, employee benefits, and service benefits of which he was allegedly deprived.

Defendant filed the motion for summary judgment on the grounds that the matter is not subject to judicial review. Plaintiff, it claims, is barred from bringing this action because his claim was submitted to TWA's Pilot System Board of Adjustment for a final and binding decision, which already has been made in accordance with the TWA collective bargaining agreement and section 204 of the Railway Labor Act Title II, as amended, 45 U.S.C. § 184.

In early 1967 August Paul Rossi, the Plaintiff, was hired as a flight engineer with TWA. Immediately upon his employment and continuing through the duration of his association with TWA, he was covered by the collective bargaining agreement between TWA and the Airline Pilots servicing that corporation. In January, 1969, Mr. Rossi asked to be enrolled in TWA's First Officer Training Program and was selected to participate. TWA technically violated one section of its agreement by not notifying Rossi at least 30 days in advance of his assignment to first officer training.[1] Nevertheless, Rossi did not delay the be-

ginning of his participation, as he could have done; and he joined the program.

However, the plaintiff did not perform satisfactorily. Testimony by people who attempted to instruct him indicates that he made negligible if any progress during his training period. Said one of the captains, ". . . we were making no progress . . . I could not find an area where we could make progress, and retain that progress. There was no area that I could find to build something, a foundation from which to go on into the other areas of this training."[2] At his rate Rossi would not have completed the program in the requisite time. In fact there was evidence at the hearing that he would have needed 20–25 hours of additional aircraft training in order to meet the standards of any possible proficiency.

So on March 31, 1970, Rossi was dropped from the First Officer Training Program on the grounds of unsatisfactory performance and failure to meet the standards of first officer competency.

The collective bargaining agreement sets out a procedure that a flight engineer in Rossi's position should follow,[3] and the Plaintiff did contest—albeit unsuccessfully—his termination in the manner provided in the agreement.[4]

1. Section 6–C(3) of the Collective Bargaining Agreement provides as follows:
    (3) The Company will notify in writing each flight engineer at least thirty (30) days in advance of his assignment to first officer training. A flight engineer so notified of his assignment to training shall accept such training which will start and continue as scheduled to final determination.

2. Page 65 of Hearing before TWA Pilots' System Adjustment Board, August 26, 1971. This Adjustment Board is authorized by the Railway Labor Act as amended, 45 U.S.C. §§ 153, 184.

3. Section 6–C(6) of the Collective Bargaining Agreement provides as follows:
    (6) When a flight engineer fails to qualify as first officer in his proper turn as outlined above his case shall be handled as the circumstances indicate, subject to section 21.

4. Section 21 of the Collective Bargaining Agreement provides as follows:

    SECTION 21–A
    SYSTEM BOARD OF ADJUSTMENT
    (A) The term "Company" as used in this Section shall be construed to mean Trans World Airlines, Inc. The term "Association" as used in this Section shall be construed to mean Air Line Pilots Association, International.
    (B) In compliance with Section 204, Title. II, of the Railway Labor Act, as amended, there is hereby established a Pilots' System Board of Adjustment for the purpose of adjusting and deciding disputes which may arise under the terms of this Agreement and which are properly submitted to it, which Board shall be known as "Trans World Airlines Pilots' System Board of Ad-

justment", herein referred to as the "Pilot Board".

(C) The Board shall consist of four (4) members, two (2) of whom shall be selected and appointed by the Association and two (2) by the Company, and such appointees shall be known as "Adjustment Board Members".

(D) The four (4) members shall serve for one (1) year from date of their appointment or until their successors have been duly appointed. The terms of office for the Board members shall be staggered so that only one (1) term expires in each calendar quarter (a Company member's term expiring in the first quarter, an Association member's term expiring in the second calendar quarter, and so forth). Vacancies in the membership of the Board shall be filled in the same manner as is provided herein for the selection and appointment of the original members of the Board.

(E) The Pilot Board shall have jurisdiction over disputes between any employee covered by this Agreement and the Company, growing out of grievances or out of interpretation or application of any of the terms of this Agreement. The jurisdiction of the Board shall not extend to proposed changes in hours of employment, rates of compensation, or working conditions covered by existing agreements between the parties hereto.

(F) The Board shall consider any dispute properly submitted to it by the President of the Association or by the Staff Vice President-Flying of the Company when such dispute has not been previously settled in accordance with the terms provided for in this Agreement.

(G) Appointments of members of the Board shall be made by the respective parties within thirty (30) days from the date of the signing of this Agreement and said appointees shall meet in the City of New York, New York, within forty-five (45) days from the date of the signing of this Agreement, and shall organize and select a Chairman and a Vice Chairman, both of whom shall be members of the Board. The term of the office of Chairman and Vice Chairman shall be one (1) year. Thereafter the Board shall designate one of its members to act as Chairman and one to act as Vice Chairman for (1) year terms. Each officer so selected shall serve for one (1) year or until his successor has been duly selected.

The office of Chairman shall be filled and held alternately by an Association member of the Board and by a Company member of the Board. When an Association member is Chairman, a Company member shall be Vice Chairman, and vice versa. The Chairman or, in his absence the Vice Chairman, shall preside at meetings of the Board and at hearings and shall have a vote in connection with all actions taken by the Board.

After the organization meeting referred to herein, the Pilot Board shall thereafter meet in the city where the general offices of Trans World Airlines, Inc., are maintained (unless a different place of meeting is agreed upon by the Board) during the third week in September and the first week in March of each year, provided that at such times there are cases filed with the Board for consideration, and shall continue in session until all matters before it have been considered, unless otherwise mutually agreed upon.

(H) All disputes properly referred to the Board for consideration shall be addressed to the Chairman with a copy to the Director, Labor Relation-Flight, and a copy to the Director, Flight Crew Contracts Administration. Five (5) copies of each petition, including all papers and exhibits in connection therewith, shall be forwarded to the Chairman, who shall promptly transmit one (1) copy thereof to each member of the Board. Each case submitted shall show:

(1) Question or questions at issue.

(2) Statement of facts out of which the dispute arose and the particular provision or provisions of the Agreement, if any, alleged to have been violated.

(3) Position of employee or employees.

(4) Position of Company.

When possible, joint submissions should be made, but if the parties are unable to agree upon a joint submission then either party may submit the dispute and its position to the Board with copy to the Company and the date of posting of such copy will be the significant date for pur-

poses of the thirty (30) day period provided in Section 21(C) of this Agreement.

No matter shall be considered by the Board which has not first been handled in accordance with the provisions of Section 21 of. this Agreement; provided that by agreement of the parties, matters may be submitted directly to the Board.

(I) Upon receipt of notice of the submission of a dispute, the Chairman shall set a date for hearing, which shall be at the time of the next regular meeting of the Board, or, if at least two (2) members of the Board consider the matter of sufficient urgency and importance, then at such earlier date and at such place as the Chairman and Vice Chairman shall agree upon, but not more than fifteen (15) days after such request for meeting is made by at least two (2) of said members, and the Chairman shall give the necessary notices in writing of such meeting to the Board members and to the parties to the dispute.

(J) Employees covered by this Agreement may be represented at Board hearings by such person or persons as they may choose and designate, and the Company may be represented by such person or persons as it may choose and designate. Evidence may be presented either orally or in writing or both. On request of individual members of the Board, the Board may, by a majority vote, or shall at the request of either the Association representatives or the Company representatives thereon, summon any witnesses who are employed by the Company and who may be deemed necessary by the parties to the dispute, or by either party, or by the Board itself, or by either group of representatives constituting the Board.

The number of witnesses summoned at any one time shall not be greater than the number which can be spared from the operation without interference with the services of the Company.

(K) A majority vote of all members of the Board shall be competent to make a decision.

(L) Decisions of the Board in all cases properly referable to it shall be final and binding upon the parties hereto.

(M) In the event of a decision of deadlock in any case properly referred to the Board of Adjustment, the Board shall promptly notify the parties to the case of such deadlock decision, including the date thereof, and the members of the Board shall then notify the parties that the services of a fifth member of the Board are desired. The fifth member of the Board (referee) will be selected by one of the following methods:

(1) Within ten (10) days after the proper notification, the members of the Board will select a referee from a panel of five (5) potential referees which will be set up by mutual agreement between the parties hereto at as early a date as practicable after the signing of this Agreement. Changes in said panel may be made by mutual agreement of the parties hereto.

(2) Within ten (10) days after proper notification the Company and Association representatives shall meet to select a referee by mutual agreement and if agreement is reached shall advise the members of the Board of the name and address of the referee.

Within thirty (30) days after proper notification if no agreement on the selection of the referee can be reached by either method, (1) or (2) above, the Company or the Association may petition the National Mediation Board for the appointment of a referee.

When the fifth member is selected, the Board shall, within twenty (20) days, arrange for a hearing of the dispute by the Board, including the presentation of such witnesses and evidence as the five-member Board shall in its discretion permit. A decision of a majority of the Board sitting with the fifth member shall be final and binding upon the parties thereto. Such decisions shall be rendered within ten (10) days after the close of the hearing.

If neither the Company nor the Association serves notice that the services of a referee are desired, as above provided, within thirty (30) days after either party is eligible to do so, the Board shall have no further jurisdiction in that case and the controversy shall be considered as withdrawn.

The time limits specified in this paragraph (M) may be extended by mutual agreement between the parties to this Agreement in writing.

(N) Nothing herein shall be construed to limit, restrict or abridge the

Next he submitted his grievance to TWA's Pilots' System Board of Adjustment for arbitration under sections 21(A) and 21(C) of the collective bargaining agreement. In his letter of submission, Mr. Rossi stated the issue as follows: "Whether the company was justified in discharging the grievant for the reasons assigned in the letter of termination dated March 31, 1970 and signed by R. B. Mueller, General Manager-Flying." The initial four-member Pilots' System Board of Adjustment deadlocked, and Rossi then asked that his case be submitted to a five-man panel, which would include a neutral arbitrator. TWA agreed and, in accordance with Sections 21(A) and (M) of the Agreement, the well known and highly regarded arbitrator, Mr. Sam Kagel, was selected as the fifth member from a list of names suggested by Plaintiff Rossi.

The arbitration hearing occurred on August 26, 1971, in New York City. Mr. Rossi not only attended but also brought along retained counsel. He testified on his own behalf, and his attorney was able to cross examine extensively TWA's witnesses. Enough information was presented and digested to fill a 162-page transcript; and the parties thoroughly explored from both sides the relevant issues of Plaintiff's first officer competence and whether he had been given a proper opportunity to complete the training program. Moreover, Rossi and his counsel argued these issues in their post-hearing brief.

Despite all the material presented by and on behalf of Rossi, in November 1971 the Board ruled 3–2 in favor of TWA, sustaining plaintiff's determination.[5] He then brought his case to this court.

I

From the foregoing facts, it is quite clear that TWA's augmented five-man Pilots' System Adjustment Board considered Mr. Rossi's case on the merits. The complaint filed in the United States District Court raises essentially the same issues and claims that were presented in the earlier administrative hearings.[6]

The TWA Pilots' System Board of Adjustment was created pursuant to the

---

rights or privileges accorded either to the employees or to the employer, or to their duly accredited representatives, under the provisions of the Railway Labor Act, as amended, and the failure to decide a dispute under the procedure established herein shall not, therefore, serve to foreclose any subsequent rights which such law may afford or which may be established by the National Mediation Board by orders issued under such law with respect to disputes which are not decided under the procedure established herein.

5. The Pilot Board as augmented by the fifth member, arbitrator Sam Kagel, stated:

"In the final analysis, the decision whether to terminate training or not is the Company's, there being no limitation to the contrary shown in the Agreement. The Association has not shown that there have been any abuses or discrimination against Mr. Rossi *per se*,

nor has there been a showing that the type of training that Mr. Rossi received or the experiences he underwent were in any way significantly different than that ordinarily provided. The fact that Mr. Rossi had less time in the aircraft than the training program called for was based upon the fact that even if he had had the normal amount of time, even without the alleged lack of rapport between himself and Captain Cutler, he would have not been able to qualify. The record substantiates this view." Opinion and Decision of System Board of Adjustment, TWA No. P70–16, ALPA No. NY–76–70, at 10–11, November 2, 1971.

6. This is why we find no merit in Plaintiff's contention that Section 21–A(N) of the Collective Bargaining Agreement gives him a right to have the issues heard by this court. That right obtains following the "failure to decide a dispute under the procedure established herein . . . ." (see footnote 4). But it is patently clear that the System Adjustment Board did in fact decide Rossi's dispute.

Railway Labor Act 45 U.S.C. Secs. 153, 184. The latter section provides that disputes "between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to an appropriate adjustment board . . ." In other words section 184 parallels for airlines the railroad provisions of 45 U.S.C. § 153, McBride v. Trans World Airlines, Inc., 312 F.Supp. 731, 734 (W.D.Mo. 1970), and in fact makes it the duty of each carrier and its employees to estab-

lish such a board of adjustment with jurisdiction not exceeding that of comparable railroad adjustment boards. Bower v. Eastern Airlines, Inc., 214 F.2d 623, 624 (3d Cir. 1954). Accordingly, the courts have treated such airline pilot adjustment board decisions the same as they have handled Section 153 railroad adjustment board decisions, a policy flowing from legislative intent as well as from statutory parallelism. International Association of Machinists, AFL–CIO v. Central Airlines, Inc., 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963).[7]

■ The upshot of this parallel treatment is that Pilot Board decisions, like railroad arbitration findings, may operate to constitute a bar to an action in court. This is especially true when the decision is reached on the merits. In Andrews v. Louisville & Nashville Rail-

7. 372 U.S., at 685, 686, 83 S.Ct., at 958–959:

In 1936, Congress extended the Railway Labor Act to cover the then small-but-growing *air transportation industry.* 49 Stat. 1189, 45 U.S.C. §§ 181–188. Its general aim was to extend to air carriers and their employees the same benefits and obligations available and applicable in the railroad industry.[3] But there was to be a significant variation. The 1936 amendments made applicable to the airlines all of the provisions of the Railway Labor Act, excepting § 3, 45 U.S.C. § 153, dealing with the National Railroad Adjustment Board; but including § 1, 45 U.S.C. § 151, containing definitions; § 2, 45 U.S.C. § 151a, the Act's statement of purposes; §§ 4 and 5, 45 U.S.C. §§ 154–155, relative to the National Mediation Board and its functions; and §§ 7, 8 and 9, 45 U.S.C. §§ 157–159, relating to voluntary arbitration and emergency boards. § 202, 45 U.S.C. § 182. In the place of § 3, Congress provided in § 205, 45 U.S.C. § 185, that the creation of a National Air Transport Board would be postponed until "in the judgment of the National Mediation Board, it shall be necessary to have a permanent national board of adjustment . . . ." Until the establishment of the national board for the airlines industry, § 204, 45 U.S.C. § 184, required the formation of system,

group, or regional boards of adjustment:

"It shall be the duty of every carrier and of its employees, acting through their representatives, selected in accordance with the provisions of sections 181–188 of this title, to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 153 of this title."

The duty imposed upon the parties to create adjustment boards to settle grievances was more than a casual suggestion to the air industry. The original version of S. 2496, which, as amended, became law, provided for voluntary boards of adjustment as in the case of the railroads and extended the jurisdiction of the National Mediation Board to minor as well as major disputes. But upon the suggestion of the National Mediation Board, its jurisdiction was not expanded, and the law as finally passed made compulsory the establishment of the adjustment boards. Until and unless the National Mediation Board determined to create a national board, the parties were placed under the statutory duty of establishing and utilizing system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes arising under existing contracts.

road Company, 406 U.S. 320, 92 S.Ct. 1562, 1565, 32 L.Ed.2d 95 (1972), the court indicated that ". . . in at least some situations the Act makes the federal administrative remedy exclusive, rather than merely requiring exhaustion of remedies in one forum before resorting to another. A party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding . . . In such a case the proceedings [before the adjustment board] will be the only remedy available to the aggrieved party."

Such a policy of non-review is grounded in the desire to avoid litigation. *See* Note: Judicial Review of Arbitration Awards on the Merits, 63 Harv.L.Rev. 681 (1950). In fact one must assume that the main reason the parties resorted to arbitration in the first place was to circumvent the identical protracted altercation Plaintiff now invites by coming into the Federal Courts. Both parties knew the arbitration process would be quick and cheap; moreover, the differences would be resolved by people familiar with the practical intricacies of their particular occupation. We hesitate to cancel the advantages that both sides appreciated before and during their dispute.[8]

At least one earlier case reached a holding similar to the one we adopt today. In Bower v. Eastern Airlines, supra, the plaintiff, after being terminated, sought review through the corporate and administrative channels. First he went to the airlines authorities, then to the Eastern Pilot System Adjustment Board. After losing in both forums, he transferred his case to the United States District Court, where Eastern moved successfully for a summary judgment. Affirming the lower court's decision, the Third Circuit said at 214 F.2d at p. 625, "We think it is the general rule that a court will not review the merits of a common law arbitration award which the parties have agreed to accept as final . . . Closer to the present case, essentially the same position has been taken with reference to Railroad Adjustment Board decisions under Title I of the Railway Labor Act [citing cases]. This line of cases is based upon the accepted view of such adjustment board decisions, stated by Justice Rutledge, speaking for the Court of Appeals of the District of Columbia in Washington Terminal Company v. Boswell, [75 U.S.App. D.C. 1, 124 F.2d 235 (1941), *aff'd* 319 U.S. 732, 63 S.Ct. 1430, 87 L.Ed. 1694]:

"'. . . We do not believe Congress intended that [adjustment board awards] should be circumvented by . . . judicial . . . determination de novo of the merits of the controversy . . . 'Congress intended the Board to be and to act as a public agency, not as a private go-between; its awards to have legal effect, not merely that of private advice.' 124 F.2d at pages 240, 244."

■■ Like the court in *Bower*, we see no reason for allowing a party who has submitted an employment dispute to an adjustment board for a full hearing on the merits to obtain independent review of the same issues by a Federal court. When Congress established the system adjustment boards to hear and decide airline contract disputes, it intended the boards to act as public agencies, not as private mediators. It contemplated that adjustment board awards and decisions would have actual legal effect, not merely the admonition of private advice. International Association of Machinists, AFL–CIO v. Central Airlines, Inc., 372 U.S. 682, 695, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963); Bower v. Eastern Airlines, supra, 214 F.2d at 626; Washington Terminal Co. v. Boswell, supra.

Section 21–A(L) of the contract establishing the TWA Pilots' System Board of Adjustment states, "Decisions of the Board in all cases properly referable to it shall be final and binding upon the parties hereto." Mr. Rossi properly

8. Note: Judicial Review of Arbitration Awards on the Merits, 63 Harv.L.Rev. 681 (1950).

brought his case before TWA's board and lost there on the merits. The agreement does not contemplate—and overloaded Federal calendars cannot tolerate —a litigative spillover into the District Courts.

## II

Even if Plaintiff had access to a Federal forum, he pursued the company grievance procedure to a conclusion, thus making a binding election of remedies. For this purpose we can take a momentary position that perhaps at the beginning Mr. Rossi had a choice: 1) to utilize the grievance machinery contained in the collective bargaining agreement or 2) to sue in Federal court. Rosen v. Eastern Air Lines, 400 F.2d 462 (5th Cir. 1968). This does not mean that the plaintiff may pursue to completion both remedies. Since the matter could have been litigated and resolved through either alternative, the situation is directly analogous to what exists when Federal and State courts hold concurrent jurisdiction. Washington v. Aerojet-General Corporation, 282 F.Supp. 517 (C.D.Cal 1968). In such a situation the judgment obtained in one court can be set up as res adjudicata in the other. Penn General Casualty Co. v. Pennsylvania ex rel. Schnader, 294 U.S. 189, 55 S.Ct. 386, 79 L.Ed. 850 (1935).[9] In light of the importance attached by Congress to resolving industrial disputes through collective bargaining grievance procedures, *see* United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 581, 80 S.Ct. 1347, 1350 1352, 4 L.Ed.2d 1409, 1414–1415, 1416–1417 (1960), *see also* 63 Harv.L.Rev. supra, this court

feels that if there were in fact concurrent jurisdiction between the Federal courts and the grievance procedures established in the collective bargaining agreement, the principles described above should apply. This rule in no way would restrict an aggrieved party's choice of forums, and it most certainly does not restrict Mr. Rossi. Mr. Rossi may have had an option, but he clearly made a definite decision by exercising his option to seek redress through the Pilot Board—and he adhered to that decision through a final judgment. As in the case of concurrent jurisdiction between State and Federal courts, we should consider Rossi to have made his binding election upon pursuing his remedies in the Pilots' Board forum to an administrative decision, rather than litigating in Federal court to a judicial decision. Such a rule not only is consonant with that applied in an analogous area, but also contributes to the expeditious resolution of disputes in the labor relations area and promotes sound and equitable administration of justice by precluding a party from subjecting a defendant to multiple actions based on the same claim. Washington v. Aerojet-General, supra. Under this theory, the prior arbitration of the TWA Pilots' Board constitutes a bar to the present action. It is relatively unimportant whether the theory be categorized as res judicata or voluntary election by the plaintiff. The summary judgment in favor of TWA is sustainable on either ground.[10] Having opted for arbitration, "he is bound by the rules underlying the Board's operation, one of which is the finality of its decision." Farris v. Alas-

9. Where the judgment sought is strictly in personam, for the recovery of money or for an injunction compelling or restraining action by the defendant, both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as res judicata in the other.

10. See Bower v. Eastern Airlines, supra, 214 F.2d at 626. On similar facts the court said: "Whether we say that the

party is bound by his own voluntary election between an administrative and an alternative judicial remedy, or describe the party who initiated the ·administrative proceeding as estopped from denying its agreed final and binding character, or view this as an application of the rationale of res judicata in a new area, we are satisfied that the court should declare and enforce a rule of repose against the reexamination of the merits of plaintiff's claim in this case."

ka Airlines, Inc., 113 F.Supp. 907, 909 (N.D.Wash.1953).

### III.

■ Closely related to the previous discussion is the Plaintiff's claim that the Pilot Board's decision was not sufficiently supported by the evidence. However, this Court does not have the power to review the decisions of a system adjustment board. Rosen v. Eastern Air Lines, Inc., 400 F.2d 462 (5th Cir. 1968), cert. denied, 394 U.S. 959, 89 S.Ct. 1307, 22 L.Ed.2d 560 (1968). There the court mentioned, at 464, "It is the voluntary act of the employee which gives the actions of the System Board such final authority. Upon his discharge, an employee has a choice—he may sue in court for a breach of contract of employment, or he can proceed under the agreement and the Railway Labor Act before the Board. He may not do both. Hence, 'granted jurisdiction in the Board, its decisions on either factual or legal or mixed issues, are not reviewable in court.' Woolley v. Eastern Air Lines, [250 F.2d 86 (5th Cir. 1957)]."

Hence in *Rosen*, the District Court correctly held that "the decision of the System Board on whether appellants were properly discharged or not is final and binding on the courts and not subject to review on the merits by the courts . . ." Id., at 463.[11] Even Thorgeirsson v. Trans World Airlines, 288 F.Supp. 71 (SDNY 1968), a case on which Plaintiff strongly relies, states that " . . . the Railway Labor Act requires the District Court to accept the System Adjustment Board's determination of the merits of a grievance (citing cases)." At 75.[12]

■ Only a limited number of situations exist where judicial review of a system board is possible. These arise only where there has been a denial of due process by some act of the Board. Rosen v. Eastern Air Lines, supra; Farris v. Alaska Airlines, supra, 113 F. Supp., at 909. *Farris* goes on to say that the court's inquiry ends once we find 1) the board's procedure and award conformed to the statute and the agreement, 2) the award confined itself to the letter of submission and 3) the award was not arrived at by fraud or corruption. Other courts have limited judicial review even more severely. In Bower v. Eastern Airlines, supra, the

---

11. Also see Edwards v. St. Louis-San Francisco R. Co., 361 F.2d 946 (7th Cir. 1966), where the court stated that the purpose of the adjustment board was to provide "a mandatory, exclusive, and comprehensive system for resolving grievance disputes," Gunther v. San Diego & A.E.R. Co., 382 U.S. 257, at 264, 86 S.Ct. 368, 15 L.Ed.2d 308, id. at 955. The courts have constantly noted the congressional intent that minor grievances be decided finally by the Railway Adjustment Boards, citing cases. "Appellant, therefore, cannot come before this or the district court complaining that the award of the Railroad Adjustment Board was based on insufficient evidence or that the Board incorrectly interpreted or wrongfully applied a provision of a collective bargaining agreement." *Edwards*, at 952.

12. Plaintiff's strong reliance on Thorgeirsson v. Trans World Airlines, Inc., 288 F.Supp. 71 (SDNY 1968) for the proposition that he may have had some re-

course under a Flight Engineers International Association (FEIA)-TWA collective bargaining agreement at the time of his discharge has no foundation in fact. Rossi was discharged from his employment on March 31, 1970. On March 19, 1968, the FEIA had ceased to be the duly certified and recognized exclusive bargaining representative for flight engineers employed by defendant. On that date the Air Line Pilots Association (ALPA) was duly certified as the exclusive bargaining representative for flight engineers and other airline employees employed by TWA by the National Mediation Board in Case R–3982 (March 19, 1968), and has remained the exclusive bargaining representative to this date. See supplemental Affidavit of T. M. Cromartie. So the Pilot Board created under the 1970 ALPA-TWA agreement which heard and decided Rossi's grievance was the appropriate System Board having exclusive jurisdiction over this grievance.

court stated that the District Court's inquiry into the due process issue only required that the court "determine whether the Board had given the plaintiff a full and fair hearing and had exercised its honest judgment in reaching its conclusions and decision on the full record." *Bower*, 214 F.2d at 627.

■ Plaintiff contends as part of his claim that the TWA Pilot Board's decision was indeed "arbitrary, capricious, and discriminatory and therefore violative of the Due Process Clause of the Fourteenth Amendment." Complaint ¶ VI(G). But if we look at the particular facts of Rossi's experience as he himself alleges, we must reject this assertion. The Pilot Board was free to make the determinations it did, as long as it conformed to the statute. Here it adhered to both 45 U.S.C. § 184 and the collective bargaining agreement. Moreover, the Board's decision confined itself to the issues raised in Mr. Rossi's letter of submission and the Board must have had jurisdiction over the dispute pursuant to sections 21–A(B) and (E) of the Agreement. Not only does the Plaintiff fail to allege otherwise on this point, he voluntarily took his case before the Pilot Board.

Finally, the Plaintiff was present at his hearing and was represented by counsel. He presented his oral and written arguments to the Board, testified on his own behalf, and through his counsel cross-examined TWA's witnesses. This is hardly tantamout to a denial of administrative due process or a hearing riddled with "fraud or corruption."

■ Rossi also contends that TWA's failure to notify him within 30 days before his assignment to first officer training violates due process. This too lacks merit. The Pilot Board did consider the effect of this technical violation, and they found that in view of all the evidence and the circumstances surrounding this case, the oversight is not fatal to the defendant. There is no allegation according to the Board decision, that the grievance in this case is based on that contractual violation. "Moreover, there was no request by the Grievant to delay his training for one month as he was entitled to do so. Finally there is nothing to show that had the Grievant been in a position to complete the courses which he had signed up for but was unable to complete because of change in his notification date would have significantly affected the result of this case, namely, that Captain Handy believed that 20 to 25 hours additional aircraft training would have been required for completion of the course by Mr. Rossi, which figure is three to four times the normal duration of the court." [13]

■ We also should note that any action taken by TWA prior to the actions of the Pilot Board is not subject to even limited judicial review. As was stated in *Rosen*, supra, ". . . Federal courts are without authority to review even a denial of due process which occurs prior to the actions of the System Board. Edwards v. St. Louis-San Francisco R. Co. [361 F.2d 946 (7th Cir. 1966)]. The remedy for mistreatment before the hearing officer is in the hands of the System Board, not the federal courts." 400 F.2d at 464.

Sound policy reasons underlie the decision to give a Board decision "the same finality that a decision of arbitrators would have" Gunther v. San Diego & A. E. R. Co., 382 U.S. 257, 263, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965). The main function of arbitration and of System Adjustment Boards is to serve as a

---

13. The Pilot Board found that Rossi's grievance was not based upon this claim involving the 30-day notice. Also, the Plaintiff raised the issue after he had been sent to training, thus rendering the point untimely. The Board also noted that Rossi had done nothing to prove that but for this technical violation he would have completed successfully the First Officer Training Program.

"substitute for and not a prelude to litigation." Farris v. Alaska Airlines, supra, 113 F.Supp. at 908. To believe otherwise is to render arbitration wasteful and superfluous, "and an accepted, indeed favored, method of resolving industrial disputes would atrophy for non-use." *Id.* We are reluctant, to say the least, to undermine a system which allows quick and cheap decisions rendered by a board drawn from the particular industry and familiar with the specific technical matter under consideration. *Id.* See also 63 Harv.L.Rev., *supra*, and Updegraff and McCoy, Arbitration of Labor Disputes (1946).

### IV

Plaintiff insists that summary judgment would be an overly drastic remedy denying him the opportunity to show any genuine issue. This argument ignores the fact that Mr. Rossi has failed to raise any genuine factual issues. Most of his allegations seek to review the merits of the Pilot Board's award. His "issue" regarding fraud and corruption is unsupported by affidavit; it is a mere allegation. And his final "issue", whether he was fired from his position as a flight engineer for cause, was precisely the point arbitrated before the Pilot Board. We also must remember that facts claimed by a defendant in support of a motion for summary judgment may be deemed admitted to exist unless controverted by opposing affidavits. Local Rule 3(g)(3). Rossi has not controverted any of defendant's facts.

It is for these reasons, grounded in law and public policy, that the Court necessarily finds that there "is no genuine issue as to any material fact" and Defendant is "entitled to a judgment as a matter of law." Rule 56, F.R.Civ.P. As a result, Defendant's motion for summary judgment must be granted, and the foregoing shall also constitute findings of fact and conclusions of law in addition to the formal findings of fact and conclusions of law proffered by Defendant and signed and filed November 13, 1972.